**Floyd THOMPSON, Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS, and Lodge 1049, Southern Greyhound Lines, a division of Greyhound Lines, Inc., Defendants.**

**Civ. A. No. 4289.**

United States District Court
E. D. Virginia,
Richmond Division.

April 18, 1966.

Herman T. Benn, Richmond, Va., for plaintiff.

Beecher E. Stallard, Richmond, Va., Louis P. Poulton, Washington, D. C., for defendant International Assn. of Machinists and Lodge 1049.

R. Harvey Chappell, Jr., Christian, Barton, Parker, Epps & Brent, Richmond, Va., Robert F. Houlihan, Lexing-

ton, Ky., for defendant Southern Greyhound Lines.

## MEMORANDUM OF THE COURT

BUTZNER, District Judge.

Floyd Thompson brought this action against the International Association of Machinists, a trade union, and Southern Greyhound Lines to recover damages against the union for failing to represent him properly at an arbitration hearing or in the alternative to require the company to reinstate him in a job from which he was discharged. Thompson's principal complaint is that he was not notified of the arbitration hearing.

The court concludes that Thompson is entitled to recover damages from the union. He is not entitled to relief against the company.

The International Association of Machinists was the exclusive bargaining agent for maintenance employees of the company at all times pertinent to this case. Thompson was a member of this union. Article 20 of the collective bargaining agreement executed by the union and the company provides for grievance procedures culminating, if necessary, in arbitration.

Thompson was employed by the Greyhound Lines for twenty years prior to his discharge in December 1962. Most of his employment was in the Richmond, Virginia, shop as a cleaner or greaser. In 1961 the Richmond shop was closed. He was notified of a vacancy in the Charleston, West Virginia, shop. He moved to Charleston and was employed there as a greaser.

About September 1, 1962 notice was posted of vacancies in the helper classification. Thompson bid for a position and on September 17, 1962, he was signed on as a helper subject to a probationary period. While working in this capacity, Thompson believed that he was not being accorded proper seniority rights in his work assignment. Although the contract made no provision for work assignments on the basis of seniority, Thompson, who is a Negro, went to Washington in September or October 1962 and complained to a government official that racial discrimination affected his employment. He understood that an investigation of his case was made, but no action was taken. He says that when he returned to Charleston, the superintendent of the shop chided him for making the complaint.

In the first part of December 1962 Thompson learned that he was going to be discharged. He filed a grievance with the shop committee. Shop stewards met with a representative of the company and Thompson. The stewards were unable to dissuade the company from discharging Thompson. He was discharged December 10, 1962. Thompson contends that he was discharged because of the complaint that he had made about his seniority. The company denies this and states that he was discharged because he was unable to perform his job as a helper satisfactorily.

Thompson points to a letter of commendation that he received September 24, 1962 for twenty years' service and to the fact that his record showed only five complaints about his work, none of which occurred after September 17, 1962 when he was employed as a helper. He contends that other employees would not testify to his qualifications because of racial prejudice.

The company emphasizes that two other Negroes satisfactorily completed their probationary period as helpers and were continued in this classification.

After Thompson was discharged he returned to Richmond. On January 3, 1963, the union shop chairman in Charleston wrote him outlining the effort to adjust the grievance which had been made on his behalf and stating that in the absence of favorable evidence concerning Thompson's qualifications, the union could not proceed with the grievance. Thompson carried the letter to union headquarters in Washington, where he protested his discharge and asked that the union pursue his grievance.

In February 1963 a representative of the union went to Charleston to investigate the case. He was unable to find favorable witnesses for Thompson. Later in the spring, the union representative came to Richmond and discussed the grievance with Thompson. He told Thompson that he was unable to find evidence, but thought that possibly he could win the case on a legal point. He told Thompson that he would keep in touch with him.

On November 19, 1963, Thompson's grievance was placed before a board of arbitrators in accordance with the collective bargaining agreement. Union officials did not notify Thompson of the arbitration, although one attempted unsuccessfully to telephone him as a matter of courtesy. The union was represented by the national officer and the local shop foreman. The union's principal position was that under the contract, Thompson was found by the company to be qualified when it granted his bid for the helper vacancy and that the company thereafter lacked the contractual power to disqualify Thompson. This position was contrary to the letter written by the union shop chairman on January 3, 1963, which the national official never saw until the trial of this case. It was also contrary to the discharge notice dated December 6, 1962, which the national official never saw until this case was tried. It was an argument that had scant support in the contract and no support in the practice of the parties. The arbitrators found it to be without merit.

The arbitrators also found that Thompson was unqualified for the position of helper. Thompson, of course, was not present to testify about his qualifications.

The arbitrators recognized the possibility of racial discrimination and stated that this was explored at the hearing. The arbitrators reported that the unchallenged evidence showed other Negroes bid for helper vacancies and were permanently qualified. In view of this, the arbitrators concluded, there was no evidence of any discrimination.

Paragraph 20.6(b) of the collective bargaining agreement provides:

"A record will be made of the proceedings and a stenographic transcript will be made of all testimony and evidence offered."

Despite this salutary requirement, no transcript of the hearing was made.

■ Unions must be accorded broad discretion in handling individual grievances. Ostrofsky v. United Steelworkers of America, 171 F.Supp. 782 (D.Md. 1959), aff'd per curiam, 273 F.2d 614 (4th Cir.), cert. denied, 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d 1732 (1960); Gregory, Fiduciary Standards and the Bargaining Grievance Process, 8 Lab. L.J. 843 (1957). But they are not entitled to absolute immunity. They owe a duty of fair representation. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1963); Hostetler v. Brotherhood of Railroad Trainmen, 287 F.2d 457 (4th Cir. 1961), cert. denied, 368 U.S. 955, 82 S.Ct. 397, 7 L.Ed.2d 387 (1962). A union becomes liable in damages for breaching this duty. Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191 (4th Cir. 1963); Falsetti v. Local 2026, U.M.W., 400 Pa. 145, 161 A.2d 882, 895, 87 A.L.R.2d 1082, 1098 (1960) (dictum). The duties owed by unions to their members in handling grievances are examined in Hanslowe, Individual Rights in Collective Labor Relations, 45 Cornell L.Q. 25, 46 (1959):

"It is arguable that, whatever the needs for flexibility and wide discretion in the negotiation of new or modification of existing collective contracts, no such flexibility is either needed or appropriate when rights under a contract are involved. The standards for judgment in this area have been less than perfectly formulated. In general terms they are frequently stated as follows: The union's conduct must not be wilful, arbitrary, capricious or discriminatory. The union must not have declined to press the grievance out of laziness or prejudice, or out of unwillingness to expend

money on behalf of non-members. Its decisions with respect to individual grievances must have been honest and reasonable. The rejection of a grievance by the union must have been on the merits, in the exercise of honest discretion and/or sound judgment, following a complete and fair investigation. The rejection must not have been unjust in any respect. There must not have been bad faith or fraud. The bargaining agent must not have acted in a negligent manner."

█ Thompson's grievance was not frivolous. For twenty years he had worked satisfactorily for the company. During part of that time he had done much of the work required of a helper. In the 90 days preceding his discharge no complaints about his work were documented. The discharge followed his attempt to correct what he considered to be racial discrimination. At the least he was entitled to have his complaint fully developed before the arbitrators so they could consider it intelligently.

█ The union breached the duty it owed Thompson to represent him properly in handling the grievance. He was given no notice of the arbitration. The union knew that no other witnesses would testify for him. Under these circumstances his presence was essential for a fair hearing. The union representative's preparation was perfunctory. He failed to investigate Thompson's complaint properly as evidenced by his lack of knowledge of the letter of January 3, 1963 from the union to Thompson and the letter from the company advising Thompson of his discharge. These two papers, which reflected an interpretation of the contract contrary to that urged by the representative, would have alerted the representative to the fact that the unsuccessful position he took in the arbitration was doomed to failure. Thompson's case was never fully and fairly heard. From the opinion of the arbitrators it appears that Thompson's claim of racial discrimination was not adequately presented. The arbitrators apparently were satisfied by the fact that there was no discrimination against several other Negroes in the same job classification. This was not a complete answer to Thompson's complaint that he was discharged because of his protest of racial discrimination to a government agency. Finally, the union failed to make a transcript of the hearing.

Taken singly the union's omissions might not constitute lack of fair representation. Certainly the union cannot be charged with liability simply because it urged an interpretation of the contract that found no favor with the arbitrators. It is the failure to give notice coupled with inadequate preparation and presentation that demonstrates a breach of the union's duty to represent Thompson properly.

█ Lack of notice to employees has been deemed sufficient to invalidate an arbitration award that determined seniority rights and consequent layoffs, Clark v. Hein-Werner Corp., 8 Wis.2d 264, 99 N.W.2d 132, 133, rehearing denied, 8 Wis.2d 264, 100 N.W.2d 317, cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L. Ed.2d 877 (1960); cf. Estes v. Union Terminal Co., 89 F.2d 768, 770 (5th Cir. 1937); Primakow v. Railway Express Agency, 56 F.Supp. 413 (E.D.Wis.1943) (proceedings under the Railway Labor Act). But cf. Ramsey v. NLRB, 327 F. 2d 784 (7th Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964); O'Brien v. Curran, 106 N.H. 252, 209 A.2d 723, 726 (1965) (criticizing Clark v. Hein-Werner Corp., supra).

A union might not be required to give notice to individual employees when the arbitration affects all members of the bargaining unit or when it concerns the union as an entity and not its individual members. Notice to some of a class of employees may dispense with the necessity of notice to all. Whether notice is required under these circumstances need not be explored here. An informative discussion of the problem may be found in Rosen, The Individual Worker in Grievance Arbitration: Still Another

Look at the Problem, 24 Md.L.Rev. 233 (1964).

■ The arbitration proceeding, for which Thompson did not receive notice, concerned only Thompson's grievance. It adjudicated Thompson's individual right to a job under the collective bargaining agreement. Without the agreement he had no tenure. Under the agreement he had a right to earn a livelihood in accordance with its terms. Cf. Nord v. Griffin, 86 F.2d 481, 483 (7th Cir. 1936), cert. denied, 300 U.S. 673, 57 S.Ct. 612, 81 L.Ed. 879 (1937). Thompson's contractual rights pertaining to his job were as real and vital to him as the interests in property which were protected by the requirement for adequate notice in Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) and Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

■ Thompson charges that the Greyhound Line failed to afford him a proper hearing before the arbitrators because the company did not give him notice. His claim against the company is without merit. The company occupied an adverse position to the union and to Thompson at the arbitration hearing. The contract did not require the company to give notice of the arbitration or do anything other than present its own case to substantiate Thompson's discharge. Thompson's complaint does not allege that the company conspired with the union to deny him a fair hearing. The evidence fails to show any conspiracy or joint action. Cf. Donnelly v. United Fruit Co., 40 N.J. 61, 190 A.2d 825, 843 (1963).

■ Thompson seeks damages against the union for its failure to represent him properly, or, in the alternative, reinstatement by Greyhound Lines with back salary. He is not entitled to the alternative relief. As the court has pointed out, Greyhound Lines is not liable under the theory upon which Thompson has proceeded against it. Furthermore, it appears from the evidence that Thompson's job at Charleston no longer exists. No evidence of any other job vacancy has been presented.

■ Another arbitration—which the union contends is the only relief that could be assessed against it—now would be meaningless. The union claims that Thompson's discharge, and not any failure on its part, was the proximate cause of Thompson's damages. This defense is without merit. Its allowance would negate the union's responsibility to represent an employee fairly in presenting a discharge grievance. The court cannot assume that the arbitrators would have found against Thompson if his claim had been fairly presented. In any event, the failure of the union to make a transcript of the arbitration proceedings as required by the contract forecloses this defense. The court cannot consider evidence which the union failed to preserve. Thompson is entitled to damages against the union. Cf. Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L. Ed. 173 (1944); Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191, 199 (4th Cir., 1963).

Thompson asks for the sum of $35,000 based upon the total wages he would have earned had he remained employed by the company until he reached the age of sixty-five less the wages he anticipates from other work. At the time of his discharge, Thompson's hourly wage was $2.27. After Thompson was laid off he spent some time getting in touch with the union and further time waiting to hear from the union representative. He obtained employment in Richmond in June 1963 at a wage less than he was earning from the company.

■ In April 1963, the company discharged about half of the sixty employees at the Charleston shop. Shortly afterwards the work force was reduced to twelve or thirteen. In April men with higher seniority than Thompson were discharged. If Thompson had still been with the company, he, too, would have been discharged. Whether Thompson

would have received employment in another company shop and what his classification and wage rate would have been under these circumstances are too speculative to provide a basis for damages.

The measure of damages is the loss of wages from December 10, 1962 until April 1, 1963. Thompson's delay in getting other employment was reasonable under the circumstances. His damages are $1,452.87.