619 F.2d 332
 104 L.R.R.M. (BNA) 3077, 89 Lab.Cas. P 12,152
 ABILENE SHEET METAL, INC., Abilene Area Sheet Metal
Contractors Association, and Area Association of the
Journeymen and Apprentices of the Sheet Metal Workers in
Central West Texas, Petitioners Cross Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent Cross Petitioner.
 No. 79-1770.
 United States Court of Appeals,
Fifth Circuit.
 June 16, 1980.
 
 John B. Nelson, Dallas, Tex., for Abilene Sheet Metal, Inc.
 McMahon, Smart, Wilson, Surovik & Suttle, Stephen H. Suttle, Abilene, Tex., for Abilene Area Sheet Metal Contractors Association.
 Brooks, Gordon & Long, Maurice V. Brooks, Abilene, Tex., for Area Association of the Journeymen, Etc.
 Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, John E. Higgins, Jr., Robert E. Allen, David Fleischer, Attys., NLRB, Washington, D. C., for respondent cross petitioner.
 W. Edwin Youngblood, Director, Region 16, NLRB, Fort Worth, Tex., for other interested party.
 Petition for Review and Cross Application for Enforcement of An Order of the National Labor Relations Board.
 Before GEWIN, RUBIN and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 I. Introduction
 
 1
 Three parties have petitioned this Court to deny enforcement to the order entered by the National Labor Relations Board (the Board) in this case. They are: Abilene Sheet Metal, Inc. (the Company), the Abilene Area Sheet Metal Contractors Association (the Association), and the Area Association of the Journeymen and Apprentices of the Sheet Metal Workers in Central West Texas (the Union). The Association is a group of five sheet metal contractors in the Abilene, Texas area. The members of the Association do commercial sheet metal work, which most commonly includes the installation of air conditioning and heating ducts. The Company is a sheet metal contractor that belongs to the Association. The Union is a small, independent union with ten or twelve members who are journeymen sheet metal workers. It has a collective bargaining agreement with the Association.
 
 
 2
 The Company, like other members of the Association, employs three classes of sheet metal workers: journeymen, who are the most highly skilled and the highest paid workers; apprentices, who have intermediate skill and pay; and helpers, who are the lowest skilled and least paid. The Company usually sends two man crews out to its various job sites. Each two man crew has a leadman and an assistant, who takes instructions from the leadman. Journeymen and apprentices serve as leadmen on the crews. A journeyman may be a leadman over another journeyman, an apprentice, or a helper. An apprentice can only be a leadman over another apprentice or a helper. At the time of the events leading to this case, the Company employed around eight or ten sheet metal workers.
 
 
 3
 Tom Walker came to work at the Company in May 1976. He started out at the apprentice pay rate, expecting to be raised to the journeyman rate as soon as he showed he was capable of doing journeyman work. Walker had been paid the journeyman rate when he worked for another member of the Association before he worked for the Company. After the time Walker worked for the other Association member, and before he came to work for the Company, Walker worked for a non-union contractor, who paid him substantially less than the journeyman rate that the Union had negotiated with the Association.
 
 
 4
 John Deatherage worked for the Company as a foreman. The Company paid him its journeyman wage rate plus a small "foreman's premium." Deatherage was also president of the Union. Deatherage negotiated and signed the collective bargaining agreement between the Union and the Association. Deatherage was also responsible for handling employee grievances for the Union. In January 1977, Walker filed the Union's first grievance. He sought a pay raise to the journeyman rate retroactive to the beginning of his employment at the Company. The Union refused to process Walker's grievance. Shortly after Walker filed his grievance, the Company discharged him.
 
 
 5
 The Board filed charges against the Union alleging that it committed an unfair labor practice by refusing to process Walker's grievance. The Board also filed charges against the Company and the Association, claiming that Deatherage was a supervisor of the Company and that the Company and the Association had illegally interfered with the Union. These charges were consolidated for a hearing before an Administrative Law Judge (ALJ) in June 1977. The ALJ found that the Company discriminatorily discharged Walker, that the Company and the Association illegally interfered with the Union by dealing with Deatherage, a supervisor, as president of the Union, and that the Union committed an unfair labor practice by breaching its duty to fairly represent Walker. The Board then adopted, in material part, the findings and orders entered by the ALJ. 236 NLRB No. 214 (1978), clarified 240 NLRB No. 33 (1979).
 
 
 6
 The Company, the Association, and the Union have petitioned this Court to deny enforcement to the Board's order, and the Board has cross-petitioned for enforcement of its orders. We enforce the Board order in part and deny enforcement in part.
 
 II. Standard of Review
 
 7
 We review the Board's findings of fact under the substantial evidence test, which requires us to accept findings that are supported by substantial evidence. 29 U.S.C. § 160(e) and (f). Congress, through the substantial evidence test, has directed the circuit courts to assume "responsibility for assuring that the Board keeps within reasonable grounds" in making its findings of fact. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). Substantial evidence is therefore simply "relevant evidence (that) a reasonable mind might accept as adequate to support a conclusion." Id. at 477, 71 S.Ct. at 459, quoting Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).
 
 
 8
 This simple definition of substantial evidence, however, has never been easy to apply. Justice Frankfurter explained that
 
 
 9
 (s)ince the precise way in which courts interfere with agency findings cannot be imprisoned with any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment. The difficulty is that we cannot escape, in relation to this problem, the use of undefined defining terms.
 
 
 10
 Universal Camera Corp., 340 U.S. at 489, 71 S.Ct. at 465. See also Watson v. Gulf Stevedore Corp., 400 F.2d 649, 651 (5th Cir. 1968), cert. denied 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969) (stating that the substantial evidence formula for review "is not like a standard of weights and measures"). Thus, the term "substantial evidence" is a label of convenience that the courts use to define their process of reviewing administrative decisions. See generally OKC Corp. v. Oskey Gasoline & Oil Co., 381 F.Supp. 865, 868 (N.D.Tex.1974). Individual cases applying the substantial evidence test do not define the process of review. Instead, they offer specific illustrations of it. The process of review is flexible, not constant. "It can be stretched . . . . And the courts are both willing and able to do the stretching, in accordance with what they deem to be the needs of justice." 4 K. Davis, Administrative Law Treatise, § 29.02, (1958).
 
 
 11
 Though we cannot define the process of review itself, we can delineate specific steps in the process that the courts have approved or disapproved. In reviewing administrative fact findings to determine whether they are supported by substantial evidence, we must look to the entire record, and we "must take into account whatever in the record fairly detracts from" the finding. Universal Camera Corp., 340 U.S. at 488, 71 S.Ct. at 464. The fact that we must look at the entire record on which the agency made its finding requires us to determine whether there is substantial evidence in the record that supports the finding. Aircraft Owners & Pilots Association v. Federal Aviation Administration, 600 F.2d 965, 970 (D.C.Cir.1979). See also Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966) (stating that the substantial evidence test "frees the reviewing courts of the time-consuming and difficult task of weighing the evidence").
 
 
 12
 In reviewing administrative findings, a reviewing court must not substitute its judgment for that of the agency. Watson, 400 F.2d at 651. It must decide only whether the agency made a reasonable finding, not whether it made a correct finding. 4 K. Davis, supra at § 29.01. Whether a finding is unreasonable or just incorrect depends on how strongly the reviewing court disagrees with that finding. Id. at § 29.06. Thus, a reviewing court should set aside an agency finding only if, after reviewing the entire record, it so strongly disagrees with that finding that it can conscientiously say that the finding is unreasonable.
 
 
 13
 III. Did the Company Discriminatorily Discharge Walker?
 
 
 14
 The ALJ and the Board found that the Company discriminatorily discharged Walker in violation of Section 8(a)(3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(3), for filing a grievance seeking the higher pay that a journeyman sheet metal worker, as opposed to an apprentice, receives.[1] Section 8(a)(3) provides that, "it shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization . . . ." The motive of the company for discharging Walker determines whether the discharge was discriminatory and therefore in violation of Section 8(a) (3). Mueller Brass Co. v. National Labor Relations Board, 544 F.2d 815, 819 (5th Cir. 1977); Syncro Corp. v. National Labor Relations Board, 597 F.2d at 924. Here, if Walker's filing of a grievance motivated the company to discharge him, then the discharge violated § 8(a)(3).
 
 
 15
 A. Review of the Board Finding of Discriminatory Discharge
 
 
 16
 The cases have not clearly established the degree of improper motivation required for a finding of a Section 8(a)(3) violation. In National Labor Relations Board v. Neuhoff Bros. Packers, Inc., 398 F.2d 640, 646 (5th Cir. 1968), this court reviewed various decisions requiring the company's improper motive, to be the pure motive, the real motive, a substantial motive, the moving cause, the primary motive, and the actual motive. The Court then selected a "but for" standard. "(T)o constitute an 8(a)(3) violation, an improper motive must be a cause without which the employee would not have been discharged." Id. at 647. Accord, Sweeney & Co. v. NLRB, 437 F.2d 1127, 1133 (5th Cir. 1971). This Circuit, however, has not consistently followed the "but for" test. Federal-Mogul Corp. v. National Labor Relations Board, 566 F.2d 1245, 1265 (5th Cir. 1978) (concurring opinion).
 
 
 17
 Cases frequently arise in which the company shows a legitimate reason for its discharge of an employee. When this happens, the burden shifts to the General Counsel for the Board to prove that an improper motive moved the company to discharge the employee. Delco-Remy Division, General Motors Corp. v. NLRB, 596 F.2d 1295, 1305 (5th Cir. 1979); NLRB v. Florida Steel Corp., 586 F.2d 436, 447 (5th Cir. 1978).
 
 
 18
 The state of mind of the company officials who make the decision to discharge an employee reflects the company's motive for discharge.[2] The General Counsel will rarely be able to produce direct evidence of an official's state of mind other than through the official's own, probably self-serving testimony. Shattuck Denn Mining Corp., (Iron King Branch) v. NLRB, 362 F.2d 466, 470 (9th Cir. 1966). The General Counsel, therefore, can only produce circumstantial evidence from which the Board can infer a finding of improper motive. Federal-Mogul Corp., 566 F.2d at 1264 (concurring opinion). The cases also establish the easy to state, but difficult to apply, proposition that the Board should not lightly infer improper motivation. Syncro Corp., 597 F.2d at 924.
 
 
 19
 At this point, three propositions relating to our review of the Board's finding of discriminatory discharge in this case are clear. First, once the company has shown a legitimate reason for discharge, the General Counsel bears the burden of showing that an improper motive moved the company to discharge. Second, the General Counsel, in almost all cases, can only meet this burden by offering circumstantial evidence from which the Board can infer improper motivation. Third, we review the Board's finding of improper motivation under the substantial evidence test, which requires us to enforce any reasonable finding by the Board that improper motives moved the Company to discharge. Simply put, we must decide whether the Board reasonably inferred from all the evidence in the record that the General Counsel met his burden of showing improper motive moved the Company to discharge.
 
 
 20
 The burden of proof typically has two elements: the burden of producing evidence and the burden of persuading the fact finder. E. Cleary, McCormick's Handbook of the Law of Evidence § 336 (2d ed. 1972). The fact that the General Counsel bears the burden of persuading the Board an improper motive moved the company to discharge means that the Board must find against the General Counsel if its collective mind is an equipoise on the question whether the discharge stemmed from proper or improper motives. Because we review the Board's findings under the substantial evidence test, we must review the reasonableness of the conclusion the Board drew from the record. We must determine, then, how a reasonable person might view the record.
 
 
 21
 If the Board makes a finding of discriminatory discharge, we must enforce that finding if a reasonable person might have concluded from the entire record that an improper motive moved the company to discharge. But if we decide that a reasonable person viewing the entire record could only have either concluded that proper motives moved the company to discharge or been unable to conclude whether proper or improper motives moved the company, we must refuse to enforce the Board's finding of discriminatory discharge. See Neuhoff Bros. Packers, Inc., 398 F.2d at 645 (stating that coincidence of proper and improper motives for discharge, without more, requires finding of no discriminatory discharge).
 
 
 22
 A company can best show that improper motives did not move it to discharge a complaining employee by adducing proof that other employees were discharged for the same reason that the complaining employee was discharged, when there is no suggestion that the other employees were discharged for an improper motive. For example, in NLRB v. Florida Steel Corp. the Board found that the company discriminatorily discharged an employee, Bassett, for making false statements on his employment application. This Court held that substantial evidence did not support the Board's finding of discriminatory discharge because, in large part, five other employees had been discharged at various times for making false statements on their employment applications and those five employees had no connection with union activities. 586 F.2d at 444. Similarly, in Delco-Remy Division, General Motors Corp., the company claimed it discharged its employee, Phillips, for falsifying his time card. The record contained evidence that the company had fired three other employees on earlier occasions for the same offense. We held that substantial evidence did not support the Board's finding of a discriminatory discharge of Phillips. 596 F.2d at 1305-06.
 
 
 23
 Thus, evidence that a company has a uniform policy of discharging employees for a given offense makes it likely that this court will overturn any Board finding that an employee who committed that offense was discriminatorily discharged. We have also overturned the Board's finding of discriminatory discharge for a given offenses when the Board failed to adduce proof that the company had ever done anything but discharge that offense. In Mueller Brass Co., we held that substantial evidence did not support the Board's finding that the company discriminatorily discharged its employee, Stone. The company contended and the ALJ concluded that Stone was discharged for violating a rule against unexcused absences. The court noted that, "However unreasonable the Board may consider (the discharge), there is no evidence in the record to indicate that the company had ever conducted its business otherwise." 544 F.2d at 819. See also Florida Steel Corp. v. NLRB, 601 F.2d 125, 131 (4th Cir. 1979) (holding substantial evidence did not support the Board finding of discriminatory discharge where there was no evidence that the company ever applied any penalty less severe than discharge in any case involving similar or more serious misconduct on the part of another employee).
 
 B. The Events Preceding Walker's Discharge
 
 24
 On January 1, 1977, the Company raised Walker's wage rate 75 cents to $5.00 per hour. Six months earlier, the Company had given Walker a 50 cent raise. The Company President, McWhorter, gave uncontradicted testimony that wages were sometimes based on merit, and sometimes simply based on the time an employee had worked for the Company. On January 19, 1977, Walker mailed his grievance to the Union seeking the $7.45 rate paid to journeymen sheet metal workers. Walker mailed his grievance to the Company address so McWhorter received the grievance. McWhorter testified that he opened the grievance letter, read it very briefly, and turned it over to the Union President once he realized that it involved Union business. As the ALJ noted, McWhorter testified, after giving several evasive answers, that he knew that Walker sought higher wages in his grievance letter. McWhorter also testified that the other owners of the Company, Ronald and Donald McMillan, were there when he received the grievance letter.
 
 
 25
 On Monday, January 24th, Walker approached McWhorter and asked him what he thought of the grievance letter. McWhorter himself testified that Walker said he would have no grievance if he received a raise. The next day, Walker went out on a job with a helper. On Wednesday, the 26th, a secretary told McWhorter that Walker had reported working eight and a half hours, while his helper had reported working only eight hours. On that same day, McWhorter received complaints from a customer, the Citizen's Plaza Bank in Abilene, that duct hangers that Walker had installed were falling down. McWhorter sent two other sheet metals workers out to repair the falling hangers; they took two hours to make the repairs. Apparently, Walker installed the hangers improperly. Duct hangers can be installed with nails or screws. If nails are used, they must be put into the ceiling joists horizontally because vertically installed nails will pull out. Walker installed the duct hangers at the Citizen's Plaza job by nailing vertically into the ceiling joists. Walker testified that there was not room to install the nails horizontally and that he had told his foreman, Deatherage, that he did not have any screws to use on the job. The ALJ found that Walker was not at fault.
 
 
 26
 On Thursday, January 27th, McWhorter called Walker into his office to discuss the discrepancy between the amount of time that Walker and his helper had reported working on Tuesday. Walker explained that the one-half hour overtime he reported was accumulated from prior days on which he had worked five or ten minutes of overtime and not reported it. McWhorter questioned Walker about breaks he took during the day that he did not deduct from the work time that he reported. Walker countered by saying that everyone took breaks without deducting it from the time they reported. McWhorter testified that he then told Walker that the reporting of work time was a "give and take proposition." McWhorter testified that Walker responded by saying, "I'm through giving and now I'm taking." Walker, however, denied making that statement, and the ALJ credited his denial. The ALJ found that the time card incident did not indicate any dishonesty on Walker's part because it was not repeated.
 
 
 27
 This eventful work week ended on Friday with two occurrences of possible significance. Deatherage assigned Walker to cut turning vanes with a hand hacksaw in the shop. Previously, Walker had spent 75% or 80% of his time outside of the shop working on site for customers. On prior occasions when Walker was assigned to cut turning vanes in the shop, he used an electric circular saw with a hardened Carborundum blade. The ALJ credited Walker's testimony that he was being punished by having to use a hand hacksaw when a circular saw was available. Also, on Friday, Walker was cutting a large sheet of metal on a slitting shear. Another sheet metal worker approached him, but Walker refused his assistance saying, "I'm a mechanic. I can rip it myself." McWhorter testified that anyone would have needed help to safely rip a large sheet on the slitting shear.
 
 
 28
 The owners McWhorter, Ronald McMillan, and Donald McMillan met on Monday, January 31st, to discuss Walker. McWhorter gave the only testimony regarding what went on at the owners' meeting. He testified that they discussed three, or possibly four, incidents in reaching their decision to discharge Walker. First, he testified that they discussed Walker's approaching McWhorter the previous Monday about the letter for the Union that McWhorter had received. They did not, however, discuss the contents of the letter. Second, they discussed Walker's "cheating" on his time card and Walker's statement, "I'm through giving and now I'm taking." Third, they discussed the Citizen's Plaza Bank incident in which the duct hangers that Walker had installed fell down. And finally, McWhorter testified that they might have discussed, though he was not sure, the slitting shear incident that had happened on the previous Friday. McWhorter testified that the owners agreed, "We couldn't afford (this) type of situation" and, accordingly, to let Walker go.[3]
 
 
 29
 Walker testified that the McMillans called him into their office on Thursday, February 3rd. Walker testified, without contradiction, that the McMillans said they had to lay him off because they did not have enough work of the type he wanted to do. Ronald McMillan said that they had a lot of out of town work, but that it was his understanding that Walker would not do any out of town work. Walker testified he told the McMillans that he would be happy to do out of town work to keep his job. Walker also testified that he had done a substantial amount of out of town work in the past. Walker's pleas were unavailing.
 
 
 30
 The Company later admitted that its layoff of Walker was, in fact, a discharge. The company hired a new worker shortly after it discharged Walker and when that new worker quit it hired another worker, without considering rehiring Walker.
 
 C. The Discharge Was Not Discriminatory
 
 31
 By reviewing the relevant portions of the entire record as set forth in the preceding section, we must determine whether the Board reasonably inferred that the General Counsel met his burden of showing that an improper motive moved the Company to discharge Walker. The Company undoubtedly showed a legitimate motive for discharging Walker. The undisputed evidence showed that Walker falsified his time card by reporting that he worked eight and a half hours on Tuesday, January 25, 1977, when he had in fact worked only eight hours. The Company could legitimately discharge Walker for falsifying his time card. Delco-Remy Division, General Motors Corp., 596 F.2d at 1305. The ALJ's finding that the time card incident did not indicate any dishonesty on Walker's part is not dispositive. The Company had a policy that employees were to report on their time cards for a given day only work that they had done on that day. Walker violated this policy, and we will not, as the ALJ and the Board should not have, inquire into the reasonableness of a discharge for violation of a company policy. See Mueller Brass, 544 F.2d at 819. Furthermore, the Company showed that its decision to discharge Walker was based, at least in part, on the Citizen's Plaza incident. The ALJ found that Walker was not at fault in this incident. Nonetheless, walker installed duct hangers that fell down. We do not decide whether the Citizen's Plaza incident alone could have supported the Company's decision to discharge, but we do note that the occurrence of the incident strengthens the Company's position that it discharged Walker for legitimate reasons.[4]
 
 
 32
 As more fully discussed above, once the Company showed a legitimate motive for its discharge, the burden shifted to the General Counsel to show that improper motives moved the Company to discharge. Here, there is some evidence of improper motive. The Company knew that Walker had recently filed a grievance seeking higher wages. The Company punished Walker by making him cut turning vanes by hand. Finally, the Company falsely explained to Walker that he was being laid off because there was not enough work. This evidence, however, is not conclusive.
 
 
 33
 The General Counsel had the burden of showing that improper motives moved the Company to discharge Walker. The General Counsel failed to introduce proof that the Company had ever used any penalty less severe than discharge for time card falsification. Because the General Counsel failed to offer such proof, we hold that a reasonable person might have been unable to conclude whether proper or improper motives moved the Company to discharge, or that a reasonable person might have concluded that proper motives moved the Company to discharge Walker. A reasonable person could not have concluded that improper motives moved the Company to discharge Walker. Substantial evidence does not support the Board's finding that the Company discriminatorily discharged Walker. Compare NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34-35, 87 S.Ct. 1792, 1798, 18 L.Ed. 1027 (1967) (holding that substantial evidence supported the Board's finding of discriminatory conduct as the Company failed to meet its burden of establishing legitimate motives for its conduct). Accordingly, we do not enforce that portion of the Board's order requiring the Company to reinstate Walker with backpay.
 
 
 34
 IV. Was Deatherage a Supervisor ?
 
 
 35
 The ALJ and the Board found that the Association and the Company illegally interfered with the Union in violation of Section 8(a)(2) of the Act, 29 U.S.C. § 158(a)(2), by dealing with the Company Foreman Deatherage as President of the Union. This finding hinged on the factual finding that Deatherage was a supervisor for the Company.
 
 
 36
 Whether an employee is a supervisor presents an "aging but nevertheless persistently vexing problem." NLRB v. Security Guard Service, Inc., 384 F.2d 143, 145 (5th Cir. 1967). Section 2(11) of the Act, 29 U.S.C. § 152(11), defines supervisor as
 
 
 37
 any individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly direct them, or to adjust their grievances, or effectively to recommend such action, if in conjunction with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 38
 Because the statute is disjunctive, an individual who has authority to use independent judgment in the execution of any single listed function is a supervisor. NLRB v. Big Three, etc., 579 F.2d 304, 309, n. 3 (5th Cir. 1978) cert. denied 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979); Security Guard Service, 384 F.2d at 146-147. The facts of each case determine whether an individual is a supervisor. Trailmobile Division, Pullman, Inc. v. NLRB, 379 F.2d 419, 422 (5th Cir. 1967). We review the Board's factual findings under the substantial evidence test, but because the gradations of authority within an organization can be so subtle, we accord special deference to the Board's expertise in determining supervisory status.[5] Security Guard Service, 384 F.2d at 146; Trailmobile Division, Pullman, Inc., 379 F.2d at 422.
 
 A. Deatherage's Role at the Company
 
 39
 We must look to the entire record to determine whether substantial evidence supports the Board's finding that Walker was a supervisor. Universal Camera. John Deatherage testified that his job classification was foreman, and that he was the only foreman in the Company's sheet metal business. He testified that he considered himself over the eight to ten other employees in the Company's sheet metal business. When asked whether he supervised the employees in their day to day work, he responded, "I take orders out to them, yes." Deatherage testified that he had three job responsibilities. First, he would get the men out on the various jobs in the morning. Second, he would check to see that they were doing their work properly. Third, he would work as a leadman setting up jobs, usually for other employees to complete.
 
 
 40
 Deatherage testified that he and his bosses, the owners, would decide each morning which workers to assign to the particular jobs that had to be done that day. Deatherage would suggest who was available and able to do the jobs, and the bosses would follow his suggestions about half the time. Deatherage would then relate these work assignments to the workers. Deatherage spent about 75% of his time, according to his testimony, checking on how jobs were progressing. He would drive around from job site to job site, making sure that the work was being done properly. He would give the workers instructions, using his independent judgment, on how to proceed with or correct certain jobs.
 
 
 41
 Deatherage testified that he had no authority to transfer workers from one job to another, and that he never assigned workers to a particular job without first checking with the owners, except when a worker finished a job in the middle of the afternoon and came back to the shop for reassignment. Then, Deatherage would assign that worker to a job that he knew needed to be done. The Company paid Deatherage by the hour like all the other workers, but it paid him a 25 cent per hour foreman's premium. The Company president, McWhorter, testified that Deatherage had no authority to assign workers to jobs without the owners' permission. He acknowledged, however, that Deatherage could assign new work when someone came in after finishing a job in the middle of the day.
 
 
 42
 Walker testified that he considered Deatherage the Company's only foreman. Walker testified that every morning at 8:00 a. m., Deatherage told all the workers where to go to work that day. On cross-examination, Walker admitted that he did not know whether Deatherage had authority to assign workers to jobs or whether Deatherage was simply conveying the owners' orders. Walker testified that Deatherage disciplined other workers, especially helpers. When pressed for details Walker could give only one example of when Deatherage disciplined a helper by "chewing him out" for being slow to get some blueprints out of a pickup. Walker testified the owners were very rarely at the job sites and that there was no one between Deatherage and the owners. Deatherage occasionally transferred Walker from one job to another job that was behind schedule. Walker sometimes asked Deatherage for time off, which Deatherage would allow him without checking with the owners. Deatherage, according to Walker, asked employees to work overtime on occasions.
 
 
 43
 Thus, the testimony on Deatherage's role in the company is largely uncontradicted. Deatherage would make recommendations to the owners about who they should assign to particular jobs. After carrying the owners' assignments out to the workers, Deatherage would spend 75% of his time going around checking on jobs to see how they were progressing. If someone finished a job in the middle of the day, Deatherage would assign him on his own to other work that needed to be done. Deatherage asked the sheet metal workers to put in overtime. Finally, Deatherage would occasionally transfer workers from one job another, but there is no testimony indicating that Deatherage was doing anything other than following the owners' orders when he made transfers.
 
 
 44
 B. Substantial Evidence Supports the Board's Finding That Deatherage Was a Supervisor
 
 
 45
 As discussed above, the courts give special deference to a Board finding of supervisory status because the Board is best able to grapple with the infinite and subtle gradations of authority within a company. See also NLRB v. Broyhill Co., 514 F.2d 655, 658 (8th Cir. 1975). We conclude, therefore, that substantial evidence supports the Board's finding that Deatherage was a supervisor. Security Guard Service sets the guideposts for review of the Board's finding that Deatherage was a supervisor. There, the court noted that whether an employee is a supervisor depends on the nature of his position and how completely that position's responsibilities identify its holder with management. 384 F.2d at 148, quoting International Union of United Brewery, etc. v. NLRB, 298 F.2d 297, 303 (D.C.Cir.), cert. denied 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1961). In Security Guard Service, the Court also stressed that the "natural alignment" of a person in his job bears on supervisory status. 384 F.2d at 150.
 
 
 46
 A captain, four sergeants, and six or seven guards worked in three shifts to guard a missile site in Security Guard Service. The Board found that the guard sergeants were not supervisors, and this Court enforced the Board order based on that finding. The facts there, however, differ significantly from the facts in the instant case. The guard sergeants did essentially the same work as the guards. Deatherage's duties differed substantially from those of the other employees; he spent 75% of his time checking on other people's work. Furthermore, in Security Guard Service, the employer admitted that the captain was a supervisor. Thus, the guards and sergeants were supervised. In this case, no one other than Deatherage was between the owners and the workers. The owners very rarely went to the job sites so if Deatherage was not a supervisor, the workers would be almost completely unsupervised. See Vega v. NLRB, 341 F.2d 576, 577 (1st Cir.), cert. denied 382 U.S. 862, 86 S.Ct. 123, 15 L.Ed.2d 100 (1969) (affirming the Board finding of supervisory status and noting "that if the petitioners were not supervisors, the company's employees were entirely without supervision a large part of the time"). Cf. NLRB v. Gary Aircraft Corp., 368 F.2d 223 (5th Cir. 1966), cert. denied 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971 (1967) (noting that if six leadmen were not supervisors, then 60 employees would be without supervision 80% of the time).
 
 
 47
 The facts of each case, as stated above, determine whether an employee is a supervisor. NLRB v. Broyhill Co. presents a set of facts fairly close to those in this case. In Broyhill, the Eighth Circuit found that substantial evidence supported the Board's finding that McWilliams was a supervisor. McWilliams participated in the daily preparation of work schedules. Deatherage made daily recommendations about which employees should be scheduled to do which work; the owners followed these recommendations around half the time. McWilliams assigned work projects to each employee throughout the day and reassigned the employees when they finished a project in the middle of the day. Deatherage performed a similar function in the instant case. McWilliams had responsibility to see that each employee performed his job properly and diligently. Deatherage spent 75% of his time checking on the work of other employees. McWilliams criticized employees for their poor work performance. Deatherage corrected employees who made mistakes on their jobs. Just as the Eighth Circuit found that substantial evidence supported the Board's finding that McWilliams was a supervisor, we find that substantial evidence supports the Board's finding that Deatherage was a supervisor. See also Trailmobile Division, Pullman, Inc. (enforcing the Board's finding of supervisory status for leadmen who discussed work assignments with foremen and then relayed the assignments to the workers); NLRB v. Gary Aircraft Corp., 368 F.2d 223 (5th Cir. 1966); NLRB v. Schill Steel Products, Inc., 340 F.2d 568 (5th Cir. 1965).
 
 
 48
 The record fully supports the conclusion that Deatherage had the power to make effective, non-clerical, and non-routine recommendations regarding the assignment of workers. He used his judgment in making these recommendations. His possession of one of the enumerated functions in Section 2(11) makes him a supervisor. The guideposts set out in Security Guard Service also support the Board's finding that Deatherage was a supervisor. Deatherage surely identified with management. He met with the owners each morning, helped frame their orders, and then carried their orders out to the workers. Once the workers got to the job sites, Deatherage went around checking on their work. Deatherage's natural alignment was with the owners.[6]
 
 
 49
 Deatherage himself testified that he was president of the Union and that he was responsible for handling employee grievances. The Board found that the Association and the Company interfered with the administration of the Union by dealing with Deatherage, a supervisor, as a Union official responsible for negotiating collective bargaining agreements and handling employee grievances. Accordingly, the Board ordered the Company and the Association to cease to recognize or to deal with Deatherage as a Union official in negotiating or administering any collective bargaining agreement or in handling employee grievances. The Board also ordered the Company not to permit Deatherage to serve as a Union official. Because substantial evidence supports the finding that Deatherage was a supervisor, these remedies are entirely proper.[7]
 
 
 50
 V. Did the Board Properly Rescind the Union's Certification for Failure to Represent Walker ?
 
 
 51
 The ALJ and the Board found that the Union had a duty to represent Walker and that the Union breached that duty by refusing to process Walker's grievance because he had previously worked for a non-union contractor. To remedy the Union's failure to represent an employee it was certified to represent, the Board took several actions. It set aside the collective bargaining agreement between the Union and the Association. It decertified the Union by withdrawing its recognition as bargaining representative until all sheet metal employees could vote on representation. The Board assumed Walker's grievance was meritorious and ordered the Union to make Walker whole for the differential between the journeyman's scale and his actual wages for the entire time of his employment at the company. We enforce all these orders of the Board.
 
 A. The Union Had a Duty to Represent Walker
 
 52
 In 1971 the Board certified the Union to represent a bargaining unit that expressly included "all sheet metal mechanics employed by" the Association and that expressly excluded "office clerical, professional employees, technical employees, watchmen, guards and supervisors." The Union claims it had no duty to represent Walker because he was only an apprentice sheet metal worker and not a journeyman. The Board expressly certified the Union to represent only "mechanics," and the Union contends that the term "mechanic" is synonymous with "journeyman." The Union stresses that the testimony before the ALJ supports its position that "mechanics" and "journeymen" are synonymous and that there was no contrary live testimony before the ALJ. Nevertheless, the Board properly found that the Union was certified to represent apprentice sheet metal workers as well as journeymen.
 
 
 53
 The Union gives too technical a construction to the term " mechanics." When an employee or a class of employees is neither expressly included in or expressly excluded from a unit, we look to whether that class of employees shares common characteristics with those who are expressly included or with those who are expressly excluded. See generally NLRB v. Smith Alarm Systems, 524 F.2d 983, 985 (5th Cir. 1975). Sheet metal apprentices have nothing in common with the "office clerical, professional employees, technical employees, watchmen, guards and supervisors" who are expressly excluded from the unit the Union is certified to represent. Instead, they share common characteristics with expressly included journeymen. While journeymen are more skilled sheet metal workers than apprentices, they both perform the same basic functions. Furthermore, both serve as leadmen, directing helpers in their work. Moreover, apprentices have similar interests to the journeymen, and are generally included in the same unit as journeymen. See UTD Corp., 165 NLRB 346 (1967).
 
 
 54
 The Union's own actions undercut its argument that it was not certified to represent apprentices. The General Counsel introduced into evidence the contract between the Association and the Union. This contract covered the period from July 1, 1975 to July 1, 1977. In it, the Union agreed to exert every reasonable effort to supply skilled workmen i. e. journeymen, apprentices, and helpers, when requested by the Association or any of its members. The contract also states that, "The Union claims all work requiring the knowledge, skill or ability of a Sheet Metal Worker . . . ." The Union claimed not only journeymen work, but also apprentice work. While the contract sets a wage rate only for journeymen,[8] other provisions provide special protection for all sheet metal workers. For example, the contract provides that any worker who reports to work will be paid a minimum of two hours pay even if no work is available. The contract that the Union negotiated and that the Union president, Deatherage, signed reveals that the Union itself undertook to represent apprentices. This supports the Board's conclusion that the Union was certified to represent apprentices.
 
 
 55
 The Union's name is The Area Association of the Journeymen and Apprentices of the Sheet Metal Workers in Central West Texas (emphasis added). This reinforces the Board's conclusion that the Union had a duty to represent sheet metal apprentices like Walker.
 
 
 56
 Because the Union was certified to represent all sheet metal workers, it had a statutory duty to represent fairly all of the workers. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The Union's duty to represent extended to all members of the bargaining unit, not just to members of the Union. Smith v. Local No. 25, Sheet Metal Workers International Association, 500 F.2d 741, 749 (5th Cir. 1974). The Union's duty to represent includes an obligation to serve the interests of the members without hostility or discrimination, to exercise its discretion in good faith, and to avoid arbitrary conduct. Vaca v. Sipes, 386 U.S. at 177, 87 S.Ct. at 909. The Union could not arbitrarily ignore or give only perfunctory review to a grievance. Id. at 191, 87 S.Ct. at 917. Thus, the Union had a duty to investigate in good faith Walker's grievance seeking higher pay. If the Union failed to investigate Walker's grievance in good faith, or if the Union arbitrarily or improperly refused to process the grievance, it breached its duty of fair representation to Walker and violated Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A). Local Union No. 12, United Rubber Corp., Linoleum & Plastic Workers of America v. NLRB, 368 F.2d 12, 17 (5th Cir. 1966), cert. denied 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).
 
 
 57
 B. Substantial Evidence Supports the Board's Finding that the Union Breached Its Duty to Represent Walker Fairly
 
 
 58
 The ALJ and the Board found that the Union breached its duty of fair representation to Walker in violation of Section 8(b)(1)(A) of the Act by refusing to process Walker's grievance because Walker had previously worked for a non-union contractor. We review this finding of fact under the substantial evidence test. Universal Camera. We hold that substantial evidence supports the Board's finding of a Section 8(b)(1)(A) violation.
 
 
 59
 The Union met on Thursday, January 27, 1977 to discuss Walker's grievance. The minutes of that meeting reflect that the members noted that Walker had left a Union employer, another member of the Association, to go to work for a non-union contractor. The minutes showed that Walker accepted a wage rate of $3.00 per hour at the non-union employer, a rate substantially below the Union journeyman rate, and that when Walker started work with the Company he accepted $3.75 per hour. The minutes conclude that Walker "was not placed in either shop by the Union, and the decision was reached by the members that the fault did not lie with the Union." Deatherage testified, "We did not pursue Walker's grievance because Walker left (a Union employer) and went to an non-union shop and said nothing to anyone in the Union about it." The Union contends that it did not process Walker's grievance because Walker did not have the qualifications required to be a journeyman. There is some evidence in the record supporting the Union's contention that Walker was not qualified to be a journeyman. Still, the Board had a duty to investigate the merit of Walker's grievance in good faith. The record indicates that the Union thought that Walker was not its problem. He was not a member of the Union, and he was not placed in his job by the Union. This Court finds that the Union had a duty to fairly represent Walker by investigating his grievance in good faith even though he was not a member of the Union. Substantial evidence supports the Board's finding that the Union breached its duty of fair representation by dismissing without investigation Walker's grievance because he was not a member of the Union and because he had worked at a non-union shop.
 
 C. The Board Ordered the Proper Remedy
 
 60
 The Board revoked the Union certification because the Union did not fairly represent all those in the bargaining unit. The courts generally defer to the expertise of the Board in fashioning remedies for unfair labor practices such as a breach of the duty to represent fairly. NLRB v. Directors Guild of America, Inc., 494 F.2d 692 (9th Cir. 1974). The ALJ's succinct summary of the position of Walker and the other apprentices in the Union leaves no doubt that the Board selected an appropriate remedy.
 
 
 61
 (M)ost of the sheet metal employees of the Association members are represented by a supervisor-led union which does not admit them as members; they have no voice in the negotiation of the collective bargaining agreement which covers them in the bargaining unit but which contains no wage scale for them; they are paid whatever the Association members choose to pay them; and when a grievance was filed to seek the contractual journeyman rate, the Independent refused to process it . . . . Unless the collective bargaining agreement is set aside and unless recognition of the Independent as their bargaining representative is withdawn (sic) until all of the sheet metal employees are given an opportunity to vote on representation, the employees' Section 7 rights will not be protected.
 
 
 62
 See Teamsters Local No. 671, 199 NLRB No. 167 (1972) (revoking the certification of Union that failed to represent part time warehousemen who were in the Union's bargaining unit).
 
 
 63
 The Board also ordered the Union to pay Walker the differential between the amount he would have been paid at the journeyman rate and the amount that he was actually paid for the entire time that he worked at the Company. Unions are liable in monetary damages for breaching their duty of fair representation. Thompson v. International Association of Machinists, 258 F.Supp. 235, 238 (E.D.Va.1966).
 
 
 64
 In his grievance, Walker sought to be raised to journeyman's scale retroactive to his start of work at the company. The ALJ and the Board assumed that Walker's grievance was meritorious because the Union's improper investigation of that grievance made it impossible for the ALJ to determine the merit of the grievance. The ALJ and the Board properly resolved the uncertainty in the merit of the grievance against the party that created it by an unlawful act. See P. P. G. Industries, Inc., 229 NLRB No. 107 (1977). Accordingly, we enforce that portion of the Board order requiring the Union to pay Walker the differential between journeyman's scale and his actual wages for the entire period of his employment at the Company.[9]
 
 VI. Conclusion
 
 65
 Substantial evidence does not support the Board finding that the Company discriminatorily discharged Walker. We deny enforcement to that portion of the Board order requiring the Company to reinstate Walker and to offer him backpay. We enforce the remainder of the Board's order. Substantial evidence supports all the findings of the Board, except for the finding of discriminatory discharge.
 
 
 66
 ENFORCEMENT GRANTED IN PART AND DENIED IN PART.
 
 
 
 [1]
 The ALJ and the Board also found that the company violated § 8(a)(1), 29 U.S.C. § 158(a)(1), by discharging Walker. We shall, however, only determine whether the company violated § 8(a)(3). If the company violated § 8(a)(3), it necessarily also violated § 8(a)(1). National Labor Relations Board v. I.V. Sutphin, Co. Atlanta, Inc., 373 F.2d 890, 894 (5th Cir. 1967). If the company did not violate § 8(a)(3) by discharging Walker, under the facts of this case, the company did not violate § 8(a)(1). There is no evidence of any possible § 8(a)(1) violation other than the discharge, and we think we can best determine the legality of the discharge by analyzing it under the specific statutory section, § 8(a)(3), that proscribes discriminatory discharges. See Syncro Corp. v. National Labor Relations Board, 597 F.2d 922 (5th Cir. 1979)
 
 
 [2]
 The Supreme Court has stated that frequently
 situations present a complex of motives and preferring one motive to another is in realty the far more delicate task, . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct.
 NLRB v. Erie Resistor Corp., 373 U.S. 221, 228-229, 83 S.Ct. 1139, 1145-1146, 10 L.Ed.2d 308 (1963) (footnotes omitted).
 
 
 [3]
 Walker had made mistakes that required reworking on several prior jobs. The company details these mistakes on prior jobs in its brief. McWhorter specifically testified that Walker's previous mistakes were not discussed when the owners reached the decision to discharge. We therefore consider these mistakes irrelevant to the issue whether the company discriminatorily discharged Walker
 
 
 [4]
 We do not discuss the slitting shear incident because the testimony does not clearly establish that the Company based its decision to discharge on that incident
 
 
 [5]
 The substantial evidence test is flexible. In this context, it flexes toward the Board and requires us to give their findings special deference. Compare NLRB v. San Antonio Portland Cement Co., 611 F.2d 1148 (5th Cir. 1980) (enforcing Board findings of no supervisory status)
 
 
 [6]
 The Company and the Association contend that the ALJ and the Board erroneously put the burden of proof on them to show that Deatherage was not a supervisor. The sole basis for this contention is that ALJ's statement that, "Respondents did not call any of the company's employees to dispute employee Walker's testimony" about Deatherage's role as a supervisor. This one statement does not indicate that the ALJ placed the burden of proof on the company and the association
 
 
 [7]
 The Company and the Association contend that the six month statute of limitations bars the Board charge that they interfered with the Union by dealing with Deatherage. They stress that Deatherage did not negotiate a collective bargaining agreement in the six months prior to the Board's filing of a charge. Deatherage, however, was responsible for handling employee grievances on behalf of the Union during the entire six month period preceding the Board's filing of interference charges. Deatherage's dual role as supervisor and Union President responsible for handling grievances during this period clearly show an act of interference within the statute of limitations. The fact that there were no grievances other than Walker's in this period does not alter this result. Instead, the interference itself may account for the lack of grievances
 
 
 [8]
 The contract by its terms sets a wage rate for "mechanics." This is the journeyman wage rate. The context of the term "mechanics" determines its meaning. In the contract, "mechanic" means journeyman. In the Board certification, "mechanic" means worker, i. e. journeyman, apprentice and helper
 
 
 [9]
 This is not a case in which the Company's breach of contract triggered the employee's damages and insulates the Union from liability for breach of its duty of fair representation. See Vaca v. Sipes, 386 U.S. 171, 197, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967). Walker had no contract with the company for pay at the journeyman rate. He only had a contract for pay at an apprentice rate, and his damages for receiving that lower rate for the time he worked at the Company were caused, presumptively, by the Union's failure to process his grievance in good faith. The Union has not challenged the causal relationship between its breach of duty and Walker's loss of wages, and we, therefore, do not review that question, Fed.R.App.P. 28(a)(2) & (4); Brown v. Sielaff, 474 F.2d 826 (3rd Cir. 1973). But see International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); Wells v. Southern Airways, Inc., 616 F.2d 107 (5th Cir. 1980)