**FIRST NATIONAL BANK OF BELLAIRE, Petitioner,**

v.

**COMPTROLLER OF the CURRENCY, Respondent.**

**No. 81–4221.**

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1983.

As Modified on Denial of Rehearing and Rehearing En Banc May 13, 1983.

Charles R. Vickery, Jr., E.D. Vickery, Houston, Tex., for petitioner.

J.J. Cranmore, Jr., Atty., Rolph E. Sharpe, Ronald R. Glancz, Litigation Div., of the Comptroller of Currency, Washington, D.C., for respondent.

Before GARZA, TATE, and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

The petitioner, First National Bank of Bellaire, (hereinafter the Bank), seeks to have the Cease and Desist Order issued by the Comptroller of the Currency (hereinafter the Comptroller) set aside. On July 3, 1980, the Bank was served with the Notice of Charges by the Comptroller.[1] The

1. UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY

IN THE MATTER OF )
THE FIRST NATIONAL BANK OF BELLAIRE)
BELLAIRE, TEXAS )

NOTICE OF CHARGES

TO: The First National Bank of Bellaire, Bellaire, Texas
its directors, officers, employees, and agents.

TAKE NOTICE, that on the 18th day of August, 1980, and pursuant to the Federal Deposit

charges were amended on August 28, 1980.[2] A hearing was held from September 16, 1980, through September 26, 1980, and the Administrative Law Judge certified the entire record of the hearing to the Comptroller including a recommended decision, find-

ings of fact, the hearing transcript, exhibits, rulings and all briefs and memoranda filed in connection with the hearing. The case was submitted to the Comptroller on March 6, 1981, and the Acting Comptroller

Insurance Act, as amended, 12 U.S.C. § 1818(b)(1), a hearing will commence at 10:00 a.m. in the United States Courthouse for the Middle District of Texas, Houston, Texas, into the charges set forth herein, in order to determine whether an Order to Cease and Desist (hereinafter the "ORDER") should be issued, pursuant to 12 U.S.C. § 1818(b)(1), against First National Bank of Bellaire, Bellaire, Texas (hereinafter the "BANK"), a national banking association chartered and examined by the Comptroller of the Currency of the United States of America (hereinafter the "COMPTROLLER"), pursuant to the National Bank Act of 1864, 12 U.S.C. § 27, and the BANK's directors, officers, employees, and agents.

After examination and other investigation of the BANK, the COMPTROLLER, acting by virtue of authority conferred by 12 U.S.C. § 1818(b)(1), charges that the BANK has violated federal laws, rules, regulations, and has otherwise operated in an unsafe and unsound manner, and is about to violate a condition imposed in writing by the Office of the Comptroller of the Currency in connection with the granting of the BANK's application for relocation.

### ARTICLE I

(1) The BANK has violated 12 U.S.C. § 84 by extending credit in excess of the statutory lending limits to:

 (a) Joe Denton Rental and Leasing; and

 (b) Marshall J. Brown Company.

(2) In violation of 12 U.S.C. § 29 the BANK is holding the Chimney Rock/Dashwood property in excess of the period provided in that statute.

(3) In violation of 12 U.S.C. § 371d the BANK has unauthorized investments in BANK premises in excess of its capital stock.

(4) In violation of the statutory limits of 12 U.S.C. § 375a in effect at the time of the violation, the BANK extended an excessive residential mortgage loan to Senior Vice President C.K. Wolf.

### ARTICLE II

(5) The COMPTROLLER has reasonable cause to believe that the BANK is about to violate a condition imposed in writing by the Agency in connection with the granting of the BANK's application for relocation.

### ARTICLE III

(6) Contrary to safe and sound banking practices, the BANK has been operating with inadequate capital.

WHEREFORE, the COMPTROLLER hereby commands the BANK to file an Answer to the several charges set forth herein with the Deputy Comptroller for Administration, Office of the Comptroller of the Currency, Washington, D.C. 20219, within twenty (20) days from the date of service of this Notice of Charges upon the BANK.

WITNESS, my hand and the official seal of the Office of the Comptroller of the Currency, done at Washington, D.C., this 3rd day of July 1980.

 s/

 John G. Heimann

 Comptroller of the Currency

2.

### AMENDMENT TO THE NOTICE OF CHARGES

TO: The First National Bank of Bellaire, Bellaire Texas its directors, officers, employees, and agents.

Pursuant to 12 U.S.C. § 1818(b) and 12 C.F.R. § 19.2(a), the Notice of Charges executed July 3, 1980, and duly served upon an officer of the First National Bank of Bellaire, Bellaire, Texas, (hereinafter the "BANK"), is amended as follows:

A. Pursuant to an agreement between Counsel for the BANK and Counsel for the Office of the Comptroller of the Currency of the United States of America, the commencement of the hearing has been continued from August 18, 1980 to September 16, 1980. The hearing is now scheduled to commence on September 16, 1980 at 10:00 a.m. in the Federal Building, 11th Floor, 515 Rusk, Houston, Texas.

B. Article I of the Notice of Charges executed July 3, 1980 is amended to include the following paragraph:

 "(4a) In violation of 12 U.S.C. § 30, the BANK has relocated its banking premises without obtaining a certificate of approval from the Comptroller of the Currency."

The Comptroller directs the BANK to file an answer to paragraph (4a) with the presiding officer and Counsel for the Comptroller within ten days.

WITNESS, my hand and the official seal of the Office of the Comptroller of the Currency, done at Washington, D.C., this 28 day of August 1980.

 s/

 John G. Heimann

 Comptroller of the Currency

of the Currency, Charles E. Lord, issued a Cease and Desist Order on May 28, 1981.[3]

The Comptroller conducts periodic examinations of all national banks with the most recent examinations of Bellaire Bank being on February 3, 1978, August 27, 1979 and June 7, 1980. In the June 7, 1980, examination the Comptroller found what it believed to be violations of 12 U.S.C. §§ 29, 30, 84, 371d, and 375a. Furthermore, the Comptroller believed the Bank was operating without adequate capital and was intending to relocate without receiving a certificate of approval from the Comptroller.

The issues in this case, for the most part, involve several sets of unrelated fact situations. Consequently, for the sake of clarity, the facts pertinent to each issue will be discussed with the issues.

The authority and discretion of the Comptroller presents an overriding issue in this case. The Comptroller is the supervisor and regulator of national banks. J. White, Banking Law (1976). Generally speaking the function of the Comptroller is to charter, examine and supervise all national banks. Senate Committee on Banking, Housing and Urban Affairs, The Report of the President's Commission on Financial Structure and Regulation 90 (1972). Congress has conferred broad statutory powers on the Comptroller to enable him to perform his supervisory and regulatory functions. *First National Bank of Lamarque v. Smith,* 610 F.2d 1258, 1264 (5th Cir.1980). This authority allows the Comptroller to exercise extensive controls on banks. *Groos National Bank v. Comptroller of the Currency,* 573 F.2d 889, 896 (5th Cir.1978). The Comptroller's expertise affords him a cer-

**3.**

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER
OF THE CURRENCY

IN THE MATTER OF )
THE FIRST NATIONAL BANK OF ) Docket No. AA–EC–80–11
BELLAIRE, BELLAIRE, TEXAS )

ORDER OF THE COMPTROLLER OF THE CURRENCY TO CEASE AND DESIST

WHEREAS, the First National Bank of Bellaire, Bellaire, Texas (hereinafter "BANK"), having appeared at an administrative hearing held before the Honorable Martin J. Linsky, Administrative Law Judge, upon a Notice of Charges issued against the BANK pursuant to 12 U.S.C. § 1818(b) by the Comptroller of the Currency of the United States of America (hereinafter "COMPTROLLER");

WHEREAS, the COMPTROLLER, based on the record of the hearing and the recommended decision, findings of fact and conclusions of law of the Administrative Law Judge, finds that unsafe or unsound banking practices and violations of law, rule and regulation cited in the Notice of Charges have been proven and that these practices and violations warrant the issuance of this Order to Cease and Desist;

NOW, THEREFORE, the COMPTROLLER, acting by virtue of the authority conferred on him by 12 U.S.C. § 1818(b), hereby ORDERS THAT:

ARTICLE I

(1) Within one hundred eighty (180) days of the effective date of this Order, as specified in 12 U.S.C. § 1818(b)(2), the BANK shall raise its equity capital to a level of not less than seven percent (7%) of total assets and shall maintain

its equity capital at such a level until further order of the Comptroller.

(2) Throughout this Order "equity capital" shall constitute the sum of the preferred and common stock outstanding, surplus, undivided profits and reserve for contingencies and other capital reserves, as defined in the Instructions for Preparation of Reports of Condition Income By All Insured Commercial Banks, pursuant to 12 U.S.C. §§ 161 and 1817, *et seq.*

(3) Throughout this Order, "total assets" shall be a monthly average.

(4) BANK may achieve the specified level of equity capital by the injection of additional equity capital, by the retention of earnings, by a reduction of assets, or any combination of the above.

ARTICLE II

(5) The Board of Directors shall cause management to take such actions as are necessary to correct the violations noted in the Notice of Charges (As Amended) and to implement adequate policies and procedures to insure that similar violations do not occur in the future.

ARTICLE III

(6) If, at any time, the COMPTROLLER deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States of America to undertake the COMPTROLLER from so doing.

(7) This ORDER shall remain effective and enforceable except to such extent as it is expressly and specifically stayed, modified, terminated, or set aside by action of the COMPTROLLER or a reviewing Court.

It is so ORDERED this 28 day of May, 1981.
s/
Charles E. Lord
Acting Comptroller of the Currency

tain amount of discretion in the area of banking. *See First National Bank of Eden, South Dakota v. Department of the Treasury, Office of the Comptroller of the Currency,* 568 F.2d 610, 611 (8th Cir.1978). The exercise of the Comptroller's discretion will not be disturbed unless the exercise is arbitrary, capricious or contrary to law. *First National Bank of Lamarque v. Smith, supra,* at 1264.

■ The Comptroller's discretion, however, is far from unbridled.

The Comptroller, . . ., must be subordinate to the law from which he received his authority, and is subject to the limitations imposed by that law. Therefore, if he acts in excess of his statutory grant of power, acts arbitrarily or capriciously, abuses his discretion, or unlawfully discriminates in violation of the Constitution, he is certainly subject to restraint by the courts. Though he may exercise the discretion the expertise of his office affords him, the congressional grant of authority does not empower arbitrary and capricious action, nor does it contemplate abuses of that discretion.

*Webster Groves Trust Company v. Saxon,* 370 F.2d 381, 387 (8th Cir.1966). Even if the Comptroller can give reasons for its actions, the actions are arbitrary and capricious if the Comptroller's reasons are not supportable. The Comptroller must be able to articulate a correlation between the action taken and the reason given for the action. Reasons which are in substance mere rhetoric are not sufficient and indicate arbitrary action.

■ The discretion of the Comptroller allows him, upon finding a violation, to fashion relief in such a form as to prevent future abuses. *Groos National Bank v. Comptroller of the Currency, supra,* at 897. *See Federal Trade Commission v. Mandel Bros.,* 359 U.S. 385, 392, 79 S.Ct. 818, 824, 3 L.Ed.2d 893 (1959). One form of relief available to the Comptroller is the Cease and Desist Order.[4] 12 U.S.C. § 1818(b). Congress designed the Cease and Desist power to give the Comptroller "a statutory means of moving quickly and effectively to require adherence to the law and cessation and correction of unsafe or improper practices." 1966 U.S.Code Cong. & Ad.News 3532, 3536. *See Gulf Federal Savings and Loan Association of Jefferson Parish v. Federal Home Loan Bank Board,* 651 F.2d 259, 262, 263 (5th Cir.1981).[5] In other

4. 12 U.S.C. § 1818(b)(1) provides in part:
 (b)(1) If, in the opinion of the appropriate Federal banking agency, any insured bank, bank which has insured deposits, or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such a bank is engaging or has engaged, or the agency has reasonable cause to believe that the bank or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such bank is about to engage, in an unsafe or unsound practice in conducting the business of such bank, or is violating or has violated, or the agency has reasonable cause to believe that the bank or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such bank is about to violate, a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank or any written agreement entered into with the agency, the agency may issue and serve upon the bank or such director, officer, employee, agent, or other person a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the bank or the director, officer, employee, agent, or other person participating in the conduct of the affairs of such bank.
 Note that 12 U.S.C. § 1813(q)(1) defines "appropriate Federal banking agency" to mean the Comptroller in the case of national banks.

5. The Comptroller contends that the reasoning of *Gulf Federal Savings and Loan* is not applicable in the case at hand. The cases do involve different federal agencies; *Gulf Federal Savings and Loan* involves the power of the Federal Home Loan Bank Board to issue Cease and Desist Orders while the case at bar concerns the Comptroller. The authority, power and discretion of these two agencies, however, is basically equivalent. The Cease and Desist power of both came from the Financial Institutions Supervisory Act of 1966, *Pub.L. No.* 89–695. The intent of Congress, therefore, in conferring this authority was the same as to both agencies. Furthermore, the wording of the statutory authority is almost identical. *Compare* 12

words the Cease and Desist power was envisioned as a means of correcting improprieties and not as a punitive form of relief.

In formulating the Comptroller's Cease and Desist power the objective of the Senate Committee on Banking and Currency was to balance the interest of depositors and savers, the interest of well run banks and the interest of government on the one hand against the interest of banks in receiving fair treatment from the government and in "receiving a reasonable degree of protection from arbitrary government action." 1966 U.S.Code Cong. & Ad.News 3534. In administering his authority the Comptroller must attempt to maintain this balance. The Comptroller must not become so obsessed with protecting the integrity of the national banking system that individual banks are arbitrarily treated unfairly.[6]

A Cease and Desist Order may be issued in two types of situations: when a bank is, has or is about to engage in an unsafe or unsound practice or when a bank is, has or is about to violate a law, rule, or regulation. Here, both types of situations are covered in the Cease and Desist Order. It is important to remember that both situations are limited to practices with a reasonably direct effect on a bank's financial stability. *Gulf Federal Savings and Loan Association of Jefferson Parish v. Federal Home Loan Bank Board, supra,* at 264, 265 n. 5.

### ALLEGED VIOLATION OF 12 U.S.C. § 29

On October 19, 1972 the Bank acquired a tract of land, the Dashwood property, for the purpose of future expansion. The Bank paid $42,914 for the property and it was not held under mortgage nor was it purchased to secure any debts due the Bank. The Dashwood property was being held in the Banking House account on the Bank's books. In 1974 the Bank acquired additional property for the purpose of expansion. On May 1, 1974, the Bank transferred the Dashwood property from the Banking House account to the account entitled "Real Estate Owned Other Than Bank Premises." The Dashwood property was held in this account until 1981 when it was sold.[7]

In the Notice of Charges the Comptroller alleged the Bank violated 12 U.S.C. § 29. The Cease and Desist Order commands the Bank to take such actions as are necessary to correct the violation and to implement adequate policies and procedures to insure that similar violations do not occur in the future. We hold that the Comptroller's finding of a violation of 12 U.S.C. § 29 was supported by substantial evidence and the Cease and Desist Order in this regard was proper.

The purpose of 12 U.S.C. § 29 is "to keep the capital of the banks flowing in the daily channels of commerce; to deter them [banks] from embarking in hazardous real-estate speculations; and to prevent the accumulation of large masses of such property in their hands, to be held as it were, in mortmain." *National Bank v. Matthews,* 98 U.S. 621, 626, 25 L.Ed. 188 (1878). In pertinent part 12 U.S.C. § 29 provides:

A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others:

First. Such as shall be necessary for its accommodation in the transaction of its business.

Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

U.S.C. § 1818(b)(1) *with* 12 U.S.C. § 1464(d)(2)(A).

**6.** We in no way want to infer that the Comptroller should not act zealously to prevent bank failures. We simply wish to stress that in so acting the Comptroller should not infringe on the right of individual banks to be free from arbitrary action.

**7.** The Comptroller is unwilling to concede that the Dashwood property was sold in 1981. Since, as will be seen, this determination is not necessary to answer the issue at hand, we will assume the property was sold in 1981.

Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it.

But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years.

The statute sets forth the four exclusive categories of real property a bank can purchase, hold or convey. Furthermore, if real property falls in one of the four permissible categories and the property is held under mortgage or the property was purchased to secure debts due the bank the property cannot be held more than five years. If the property does not fall in one of the four permissible categories the five-year limitation on real estate obtained through mortgage foreclosure or the like does not apply. See generally J. White, Banking Law (1976). If the five-year limitation is applied to property outside the four permissible categories (to property which the bank is not authorized to hold) the effect would be to allow the bank to hold unauthorized property, which is held under mortgage or was purchased to secure debts due the bank, for five years. Such a construction would clearly be contrary to the intent of Congress. The five-year category was meant to limit the four permissible categories and not to expand them.

■ The Dashwood property was originally acquired for future expansion. Property held for future expansion is that which is necessary for the accommodation and furtherance of banking business. See Exchange Bank of Commerce v. Meadors, 199 Okl. 10, 184 P.2d 458, 463, 464 (1947); 2 Whitley, Schlichting, Rice & Cooper, Banking Law § 26.10[2]. The Bank was properly holding the property until 1974. In 1974, however, when the property was moved to the "Real Estate Owned Other Than Bank Premises" account the property was no longer being held within the four permissible categories of 12 U.S.C. § 29. The Bank, therefore, was under a duty to divest itself of the property in a reasonable time. In view of the entire record we find that as a matter of law the Bank did not divest itself of the Dashwood property in a reasonable time.[8] The Bank, therefore, violated 12 U.S.C. § 29 and the Cease and Desist Order was proper.[9]

### ALLEGED VIOLATION OF 12 U.S.C. § 375a

On February 22, 1979, the Bank made a loan to C.K. Wolf, a Senior Vice-President, of $48,000 for a real estate mortgage. At that time the statutory limit set forth in 12 U.S.C. § 375a(2) was $30,000. The loan, therefore, was made in violation of the statute. On March 10, 1979, however, an amendment to the statute became effective raising the limit to $60,000. The Notice of Charges alleges the Bank violated 12 U.S.C. § 375a by making an excessive residential mortgage loan to C.K. Wolf. The Cease

8. In light of the Comptroller's expertise in the area of banking and the Comptroller's power to promulgate regulations under 12 U.S.C. § 25a(e), we are inclined to leave the task of establishing guidelines for determining reasonableness to the Comptroller. The only guidance we provide is that the facts of this case establish unreasonableness. Here the property was held for approximately seven years; Houston incurred tremendous growth during these seven years; and expert testimony established that a market existed for the property. These facts establish without question that the Bank could have sold the property in a much shorter time if it had exercised due diligence. The Bank argues that due to a street widening project during part of this period, by holding the property, the Bank was able to make a substantial profit on the property. This argument only establishes that the Bank was holding the property for speculative purposes in violation of the intent of 12 U.S.C. § 29.

9. The Comptroller's brief stated that 12 U.S.C. § 29 "requires that national banks divest themselves of unauthorized realty within five years." It appears that portions of 12 C.F.R. 7–3000–7–3025 may be based on this inexact proposition. Since 12 C.F.R. 7–3000–7–3025 did not cover the facts of the case at hand the question of the validity of these regulations is not before us. The Comptroller, however, for the sake of clarity may wish to reevaluate portions of these regulations in light of this opinion.

and Desist Order directed the bank to correct the violation and to implement adequate policies and procedures to insure that similar violations do not occur in the future.

A Cease and Desist Order was clearly proper. The facts are undisputed and the Bank admits it was in violation of the statute when the loan was made. There is undoubtedly a direct relationship between compliance with 12 U.S.C. § 375a and a bank's soundness.[10] Even though a subsequent amendment to a statute may correct a violation the amendment does not annul the violation which has already occurred. In this case, therefore, even though the amendment corrected the violation of 12 U.S.C. § 375a and the Wolf loan is now lawful, the limits of 12 U.S.C. § 375a were still violated. The Comptroller, consequently, was properly acting within his discretion in issuing a Cease and Desist Order requiring the Bank to implement adequate policies and procedures to insure that 12 U.S.C. § 375a is not violated in the future.[11]

### ALLEGED VIOLATIONS OF 12 U.S.C. § 84

With certain exceptions, 12 U.S.C. § 84 limits the amount a bank can lawfully loan to one person or entity to ten percent of the amount of the bank's capital stock actually paid in and unimpaired and ten percent of the bank's unimpaired surplus fund. The Notice of Charges alleged that the Bank violated the lending limits of 12 U.S.C. § 84 by extending credit in excess of the statutory lending limits to Joe Denton Rental and Leasing (hereinafter Denton) and Marshall J. Brown Company (hereinafter Brown). The Cease and Desist Order directed the Bank to correct the violations and to implement adequate policies and procedures to insure that similar violations do not occur in the future. The Brown and Denton situations shall be dealt with separately.

The testimony and exhibits clearly indicate that the total amount of Denton's obligation to the Bank exceeded the ten percent limit. The Bank, however, contends that Denton's obligations fall within exception 13, 12 U.S.C. § 84(13), and it, therefore, was not violating the statute. Exception 13 provides that obligations of a guarantor of installment consumer paper which carries an unconditional guarantee by the party transferring the obligation are subject to a twenty five percent limitation. The Comptroller found that exception 13 did not apply. We disagree.

The Bank had the burden of proving that exception 13 applies. The proponent of a rule or order has the burden of proof. 5 U.S.C. § 556(d). The Comptroller, therefore, had the burden of showing the Bank made loans in violation of ten percent limit. The Comptroller met this burden by showing what the ten percent limit for the Bank was on a certain date and that the obligations of Denton to the Bank were in excess of that limit. Once the Comptroller proved this, the burden shifted to the Bank to prove that exception 13 applied. *See Environmental Defense Fund Inc. v. Environmental Protection Agency*, 548 F.2d 998, 1014 (D.C.Cir.1976), *cert. denied*, 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *National Labor Relations Board v. Mastro Plastics Corporation*, 354 F.2d 170, 176 (2d Cir.1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). As the proponent of exception 13, under 5 U.S.C. § 556(d), the Bank had the burden to maintain.

---

10. Statutes such as 12 U.S.C. § 375a have been adopted because of bank failures due to the overborrowing of bank funds by bank officials. 49 A.L.R.3d 727, 731. In discussing that 1978 amendment Congress pointed out that insider abuses are the number one cause of bank problems and failures. 1978 U.S.Code Cong. & Ad. News 9283.

11. The Comptroller has the authority to require a bank to call in a loan if such action is needed to correct a violation of 12 U.S.C. § 375a. *See*

*Groos National Bank v. Comptroller of the Currency, supra,* at 897. *See also Norman v. Baltimore & Ohio Railroad Company,* 294 U.S. 240, 304, 55 S.Ct. 407, 414, 79 L.Ed. 885 (1935). Since the violation here was corrected by the amendment, the Bank was not required to take any action to correct the violation. To require the Bank to cancel the Wolf loan would have been punitive in nature and consequently, in violation of the intent of 12 U.S.C. § 1818(b).

The Comptroller contends that the Bank failed to meet its burden in two respects. First, the Comptroller contends that the Bank failed to meet the certification requirements of exception 13. Denton was not required to comply with the certification provisions in 12 U.S.C. § 84(13). If a bank is relying on the direct obligor and not the guarantor it does not have to comply with the 25 percent limit. To avoid the 25 percent limit, among other things, the bank must certify that the responsibility of the maker of the obligation has been evaluated and the bank is relying primarily on the maker of the obligation for payment. The certification does not apply to the 25 percent limit. *See* 1959 U.S.Code Cong. & Ad.News 2299, 2303. The Bank, therefore, did not fail to meet its burden of proof in this regard.

Second, the Comptroller found that exception 13 did not apply because the Bank failed to prove that Denton was a guarantor, rather than a direct obligor. The Comptroller's finding was not supported by substantial evidence. Mr. Emshoff, a bank examiner, testified that Denton did give a guarantee.[12] The Comptroller has not pointed to any evidence to refute this testimony.[13] In viewing the record as a whole we conclude that the Comptroller's finding, that exception 13 was not applicable, was not supported by substantial evidence.[14] Consequently, the Cease and Desist Order as it relates to 12 U.S.C. § 84, concerning Denton's obligations, must be set aside.

12. Record on Appeal Vol. 7–120.
 Q Mr. Emshoff, you have searched your files. Did you find any reference to a guarantee agreement?
 A Yes.
 Q Was there a guarantee agreement?
 A Yes.
 Q Who gave the guarantee?
 A Joe Denton, Jr.

13. The Court has searched the record in an attempt to find substantial evidence to support the Comptroller's finding. This search has proved fruitless.

14. In addition to the testimony of Mr. Emshoff, Bank exhibits 147 and 184 and Comptroller's exhibit 195 support the applicability of exception 13. None of the evidence specifically states that the obligations involved were installment consumer paper. The logical implication of the evidence, however, is that the obligations were installment consumer paper. Furthermore, the Comptroller has failed to argue otherwise.

 The Comptroller did argue that the proof that Denton guaranteed the obligations did not prove that he was not a direct obligor of those credits. This argument is not logical. In this type of transaction Denton could be a guarantor or a direct obligor but not both. Since Denton was a guarantor, he could not have been a direct obligor.

As to Brown's obligations to the Bank, the Bank does not attempt to directly refute the charge that the total amount of Brown's obligations to the Bank exceeded the ten percent limit of 12 U.S.C. § 84. The Bank's only defense to this charge is a defense also raised in conjunction with the Wolf and Denton loans. The Bank contends that Wolf, Denton and Brown are indispensable parties and the charges relating to them should be remanded for their joinder. We find this contention to be erroneous. Since none of the parties have claimed an interest in the proceedings and their absence does not prevent the Comptroller and Bank from obtaining complete relief, the parties were not indispensable under rule 19 of the Federal Rules of Civil Procedure. The Cease and Desist Order, therefore, must stand as it relates to the violation of 12 U.S.C. § 84 concerning the Brown obligations.

## ALLEGATION OF UNSAFE AND UNSOUND PRACTICES

The Notice of Charges alleges that "contrary to safe and sound banking practices, the Bank has been operating with inadequate capital." The Cease and Desist Order commands the Bank to adjust its equity and assets so as to raise the Bank's equity capital to total assets ratio (hereinafter EC to TA ratio) to not less than seven percent. The Bank asserts that the Comptroller's finding that the Bank's capital level was unsafe and unsound was not supported by substantial evidence. We agree.

In determining if there is substantial evidence to support the Comptroller's findings we must look at the entire record, including evidence that fairly detracts from the Comptroller's findings. *Abilene Sheet Metal, Inc. v. National Labor Relations Board,* 619 F.2d 332, 337 (5th Cir. 1980). *See Equifax, Inc. v. Federal Trade Commission,* 678 F.2d 1047, 1052 (11th Cir. 1982). In reviewing the Comptroller's findings we must not substitute our judgment for that of the Comptroller. *Abilene Sheet Metal, Inc. v. National Labor Relations Board, supra* at 337. This Court must determine if the Comptroller made a reasonable finding, not whether it made a correct finding. *Id.* at 338. The findings are unreasonable if there is no rational connection between the evidence as a whole and the findings. *J.H. Rose Truck Line, Inc. v. Interstate Commerce Commission,* 683 F.2d 943, 948 (5th Cir.1982).

The Comptroller's finding was unreasonable because there was no rational relationship between the evidence, when looked at as a whole, and the finding. There is evidence in the record which, on its face, supports the Comptroller's finding. When this evidence is looked at in light of the entire record, however, it becomes clear that this evidence is not substantive. The Comptroller acted unreasonably in relying on these bits of evidence in light of the entire record.

Unsafe and unsound banking practices "encompass what may be generally viewed as conduct deemed contrary to accepted standards of banking operations which might result in abnormal risk or loss to a banking institution or shareholder." *First National Bank of Eden, South Dakota v. Department of the Treasury, Office of the Comptroller of the Currency, supra,* at 611 n. 2. In making its finding that the Bank's capital level was unsafe and unsound the Comptroller primarily relied on the testimony of Mr. Vaez, an expert called by the Comptroller. Mr. Vaez analyzed the Bank's capital adequacy in accordance with quantitative and qualitative factors underlying the Comptroller's policy. Record on Appeal Vol. IX p. 11–12. The Administrative Law Judge and the Comptroller gave great weight to this analysis. A closer look is, therefore, warranted.

Mr. Vaez's qualitative analysis did not indicate that problems existed. Mr. Vaez found the quality of the Bank's assets, the Bank's earnings and the Bank's liquidity and deposit structure to be basically strong. Record on Appeal Vol. IX p. 13–17. He found the Bank's management and ownership to be acceptable but did note problems in regard to planning and internal operating controls. *Id.*

In June of 1980 the Comptroller's bank examiner rated the Bank on a one to five scale in regard to these same qualitative factors. Record on Appeal Vol. III p. 1408. The Bank received the highest possible one rating for quality of assets, liquidity and earnings and a two rating for management. These qualitative factors, therefore, indicated only slight problems in the Bank's operations.

Mr. Vaez also engaged in a quantitative analysis of the Bank's capital. Part of this analysis involved projections which showed future equity shortfalls. Based on Mr. Vaez's own testimony, we must discount the weight of these projections. These projections were based on estimates of the Bank's asset growth rate. The Comptroller's bank examiner projected the Bank's asset growth rate at ten to fifteen percent while Mr. Vaez used a twenty-one percent growth rate. Bank–X–118; Vol. IX p. 119. While stating that the bank examiner was in a better position than himself to predict the rate of growth, Mr. Vaez termed the examiner's prediction as "purely conjectural." Record on Appeal Vol. IX p. 127, 128. It is, therefore, clear that these projections were conjectural and cannot be given substantial weight.

The other aspect of Mr. Vaez's qualitative analysis involves a rather in-depth look at the Bank in relation to peer group banks with regard to a variety of equity related ratios. This analysis reveals two factors which Mr. Vaez finds to be significant. First, the Bank's EC to TA ratio was 5.28 percent which is well below the 7.0 percent

level that Mr. Vaez deemed appropriate. Second, the Bank ranked near the bottom of its peer group in all of the equity related ratios. When these two factors are looked at in light of the entire record, they do not indicate that the Bank's capital level was unsafe or unsound.

Mr. Vaez's testimony does not demonstrate a correlation between the Bank ranking towards the bottom of its peer in an analysis of equity related ratios and a finding that the Bank's capital level was unsafe and unsound. Obviously, this peer group analysis indicates that a majority of banks, approximately the same size as Bellaire Bank, maintain a higher level of equity than Bellaire Bank. This analysis may indicate that further investigation is needed. It does not, by itself, prove that the Bank's capital level was unsafe and unsound. It is very possible that all the banks in the peer group are maintaining a safe and sound capital level. Without a connection between the peer group analysis and a finding of unsafe and unsound capital levels, therefore, the peer group analysis does not support the Comptroller's finding that the Bank's capital level was unsafe and unsound.

◼ Judicial review of statutory cease and desist orders is a two-part process. First the court must satisfy itself that there is substantial evidence to support the order. Next the court must test the remedy against the arbitrary and capricious standard. *See Groos National Bank v. Comptroller of the Currency* [573 F.2d 889 (5th Cir.1978)], *supra.* It is not necessary for us to determine whether the cease and desist order instructing the Bank to raise its ED to TA ratio to seven percent was arbitrary

or capricious, however, for Mr. Vaez' testimony and the record as a whole do not indicate that the Bank had an unsafe or unsound capital level. Mr. Vaez' opinion as to an unsafe ED to TA ratio for the Bank was based on his rate of growth projections which were discounted earlier. The level was also based on Mr. Vaez' peer group analysis which as stated earlier does not, by itself, prove unsafe or unsoundness. See Record on Appeal, vol. IX p. 95. Furthermore, Mr. Vaez' testimony failed to demonstrate that his conclusions were not arrived at arbitrarily.[15]

The record as a whole does not provide support for the Comptroller's finding that the Bank's capital level was unsafe and unsound. The record, in fact, is to the contrary. Two expert witnesses found the Bank's EC to TA ratio to be adequate. One of the experts stated that a bank's EC to TA ratio could be as low as four percent and be adequate. Record on Appeal Vol. VIII p. 136–138. Furthermore, the EC to TA ratio for all banks in 1979 was 5.45 percent, and the Comptroller found this level to be acceptable. *See* Bank–X–50. Finally, note that in the 1930's the EC to TA ratio for all banks was at its highest level and yet bank failures, also, hit a record high.[16] Record on Appeal Vol. IV p. 181.

Mr. Vaez did state that if the Bank continued its present level of equity capital "it would be an abnormal risk, damage, and/or loss to the institution, to the depositors, shareholders, and to the insurance fund of the FDIC." After analyzing the basis of this opinion and reviewing the record as a whole, we conclude that the Comptroller's reliance on this statement was unreasonable. As shown, Mr. Vaez's analysis does not support his conclusion. Furthermore,

**15.** For example, Vaez testified that "capital should be sufficient in amount so as to absorb losses which may be incurred in periods of uncertainty." Record on Appeal Vol. IX p. 161. He stated that if the Bank has an EC to TA ratio from 7.0 to 7.5 the uncertainty will be covered. Record on Appeal Vol. IX p. 170. He then indicated, however, that he did not know how much capital the Bank needed to cover uncertainty. Record on Appeal Vol. IX p. 170, 171. This type of ambiguity as to the need for the Bank to maintain a seven percent EC to TA ratio was prevalent throughout Mr. Vaez's testimony.

**16.** Note that the burden was on the Comptroller to show the correlation between the Bank's EC to TA ratio and its finding of unsafe and unsoundness. We point out facts to the contrary merely to show the unreasonableness of the Comptroller's decision.

Although not relying on this information, we also note that the Federal Deposit Insurance Corporation has established a minimum acceptable EC to TA ratio of five percent.

statements by Comptroller Heimann do not support Mr. Vaez's statement. Comptroller Heimann has said that data on bank failures indicates that banks do not fail because of capital problems. Record on Appeal Vol. III p. 128. This indicates that even if the Comptroller had proved capital inadequacy it would not necessarily indicate the Bank was in any danger. Comptroller Heimann, also, stated that consistent bank earnings are the key to healthy financial institutions and the principal factor in influencing capital adequacy. Record on Appeal Vol. III p. 1218. Since the Bank's earnings were strong, this would indicate that the Bank was not facing any serious risk due to equity shortfalls.

 We realize that by examining the basis of Mr. Vaez's opinion we have, in some respects, made a judgment as to Mr. Vaez's credibility contrary to that of the Administrative Law Judge. Although the ALJ generally is upheld on credibility determinations, there are certain times when a court must override such a determination by examining evidence in the record that detracts from the ALJ's finding. *Midwest Stock Exchange, Inc. v. National Labor Relations Board,* 635 F.2d 1255, 1263 (7th Cir. 1980). In this case it has been necessary to examine the evidence that detracts from the ALJ's determination and override that determination.

 In light of the reasoning set forth above, the Cease and Desist Order, as it relates to the Comptroller's finding that the Bank's capital level was unsafe and unsound, must be set aside.

## ALLEGED VIOLATION OF 12 U.S.C. § 30

On April 19, 1979, the Bank applied to the Comptroller for approval of a change of location of its head office. On September 25, 1979, the Bank received a letter from the Comptroller informing the Bank that its relocation plan had been approved. The letter went on to say:

This approval is granted, subject to equity capital being increased to a level suitable to the regional office prior to the relocation. Enclosed is an application which should be completed and returned to this office as soon as possible.

The Bank planned its relocation for July 21, 1980. On June 30, 1980, the Bank received a letter from the Comptroller dated June 26, 1980. This letter stated that for the Bank to meet the condition imposed on the Comptroller's approval of relocation the Bank must increase its EC to TA ratio to seven percent. The Bank moved on July 21, 1980, without receiving a certificate of approval from the Comptroller.

The Notice of Charges alleged the Bank violated 12 U.S.C. § 30 by relocating its banking premises without obtaining a certificate of approval from the Comptroller. The Cease and Desist Order directs the Bank to implement adequate policies and procedures to insure that similar violations do not occur in the future. The Bank seeks to have this portion of the Cease and Desist Order set aside. We find that there was substantial evidence to support the Comptroller's finding of a violation of 12 U.S.C. § 30 and approve this portion of the Cease and Desist Order.

 12 U.S.C. § 30 provides "... no change of ... location shall be valid until the Comptroller shall have issued his certificate of approval of the same." The Bank moved without a certificate of approval and, consequently, violated the statute. The Bank contends the Comptroller abused its authority by not giving the Bank a certificate of approval. Even if this is true, it does not excuse the Bank of its violation of 12 U.S.C. § 30. The Bank knew it needed a certificate to relocate and knew it did not have a certificate. If the Bank felt the Comptroller was wrongfully refusing to issue a certificate, the Bank should have initiated the appropriate legal proceedings to force the Comptroller to issue the certificate of approval. The Comptroller's finding of a violation of 12 U.S.C. § 30 was, therefore, supported by substantial evidence.

## CONCLUSION

Article I of the Cease and Desist Order regarding capital levels and Article II of

the Cease and Desist Order regarding the alleged violation of 12 U.S.C. § 84 concerning the Denton loans must be set aside. The rest of the Cease and Desist Order shall stand.

AFFIRMED IN PART, REVERSED IN PART.

TATE, Circuit Judge, dissenting in part:

I concur with much of the majority's opinion, but I respectfully dissent from its holdings (1) that the Comptroller erred in determining that, contrary to "safe and sound banking practices", the respondent bank has been operating with inadequate capital, and (2) that the Comptroller was without authority to order recall of a loan to a bank officer in violation of the statutory limit then provided by 12 U.S.C. § 375a(2), because an amendment of the statute subsequent to the loan had increased the loan limit to an amount exceeding the earlier then-illegal loan.

### 1. "Unsafe and unsound" banking practices.

The Comptroller is authorized to issue cease and desist orders, after hearing and subject to judicial review, when a bank subject to his regulation "is engaged or has engaged ... in an unsafe and unsound practice in conducting the business of such bank." 12 U.S.C. § 1818(b)(1). The majority correctly cites the jurisprudential test to the effect that unsafe and unsound banking practices encompass "conduct deemed contrary to accepted standards of banking operations which might result in abnormal *risk* or loss to a banking institution or shareholder." *First National Bank of Eden v. Department of the Treasury,* 568 F.2d 610, 611 n. 2 (8th Cir.1978) (emphasis added). "The Comptroller's statutory duties require the closest monitoring and continuous supervision of these institutions [national banks]. Thus, the Comptroller's discretionary authority to define and eliminate 'unsafe and unsound' conduct is to be liberally construed." *Independent Bankers Association of America v. Heimann,* 613 F.2d 1164, 1168–69 (D.C.Cir.1979), *cert. denied,*

449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980).

Here, the Comptroller found that the respondent bank's capitalization ratio (ratio of equity capital to total assets) of 5.28 percent was an unsafe and unsound banking practice. The cease and desist order directed the Bank to adjust its equity and assets to a 7 percent ratio—i.e., to raise more capital, or to lend less so that the equity capital provided a safe and sound cushion. For reasons to be noted, I find to be supported by substantial evidence the Comptroller's determination that the present 5.28 capitalization ratio of this bank is inadequate for safe and sound banking practice.

Once this determination is properly made, the remedy of requiring the proper rate (in this case, 7 percent) is left to the Comptroller's broad discretion, to be set aside on judicial review only if arbitrary and capricious (see below). " '[T]he relation of remedy to policy is peculiarly a matter for administrative competence' ... [and the administrator's] choice of sanction [is] not to be overturned unless the Court of Appeals might find it 'unwarranted in law or ... without justification in fact....' " *Butz v. Livestock Commission Company,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973). "The law is fortunately sensible to recognize that in a highly technical area the evaluation of action and appropriate disciplinary sanction necessarily requires that the agency be vested with a wide range of discretion in the imposition of penalties.... Our review of the sanction imposed is confined to the inquiry of whether there has been an abuse of discretion." *Nadiak v. Civil Aeronautics Board,* 305 F.2d 588, 593 (5th Cir.1962).

At least implicitly contrary to these principles, the majority seems to indicate that not only must the Comptroller prove that the present bank's capitalization is inadequate, but that he must also prove that the rate of 7 percent required by him is appropriate (rather than, say, 6.8 percent or 5.8 percent). In my view, the majority errs in assuming that the Comptroller has the bur-

den of establishing a particular rate of capitalization, once that official has found the present capitalization ratio to be inadequate. Rather, under the standard of judicial review imposed upon us by statute, the burden is upon the respondent seeking judicial review to establish that the Comptroller-determined capitalization ratio is arbitrary or not supported by substantial evidence.

The bank-regulation statute specifically makes the Comptroller's action subject to judicial review under the Administrative Procedure Act. 12 U.S.C. § 1818(h). No procedural irregularity, deprivation of constitutional right, or action in excess of statutory authority is complained of here. Therefore, under the terms of the Administrative Procedure Act, the Comptroller's action in determining unsafe and unsound capitalization and in requiring increase to a 7 percent ratio may not be set aside unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or unless "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

In my view, bound by this standard of judicial review, the Comptroller's determination that the present bank's capitalization ratio was unsafe and unsound is supported by substantial evidence, and neither his use of peer group analysis as an aid in determining the issue, nor (as earlier stated) the sanction imposed by him raising the capitalization ratio to a 7 percent ratio, was arbitrary or capricious and thus subject to judicial modification.

Insofar as the majority finds fault as a matter of law with the Comptroller's use of peer group analysis—comparing the subject bank's practices with those of comparable size and location—, I am unable to find that the Comptroller's use of such was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Comptroller noted that he was aware of the limitations of peer group analysis and did not rely exclusively upon it, but he felt that evidence of the usual and customary practices of other banks under similar circumstances was rele-

vant and admissible in attempting to establish a standard of care, an accepted evidentiary principle, and he found some support for concluding that the present bank was undercapitalized in the composite judgment of the bank's peers as to a safe and sound level of capitalization as reflected by the risk experience of banks similar to the present bank.

I do not find arbitrary or capricious this use by the Comptroller of peer group analysis as probative (but not determinative) of a safe and sound level of capitalization for the present bank. I find unwarranted as a matter of law or as a substitute of judicial for administrative reasoning the conclusion of my brothers of the majority that, in the absence of further evidentiary connection of the levels of capitalization of peer group banks with (un)safe and (un)sound banking practices, the peer group analysis may not be used in (partial) support of the Comptroller's finding that the present bank's capital level, substantially below the peer group level, was unsafe and unsound.

Before turning to the substantial evidence issue, I should briefly note the respondent bank's contention, in part accepted by the majority, that its level of capitalization was safe and sound because in fact it had operated profitably, with assets and liquidity sufficient for this purpose. In addition to relying upon specific deficiencies of the bank in planning for future needs, the Comptroller commented with regard to this argument: "Earnings performance, except over a very long period, can be a misleading indication of management quality. The imprudent manager may, with good fortune, produce the same results which the prudent manager may with far less risk exposure." With regard to the bank's contention that its capitalization was adequate for readily foreseeable needs, the Comptroller pointed out the accepted principle, supported by the agency's expert, that a principal purpose of banking capital is to provide a cushion for " 'unanticipated', 'abnormal', and 'unexpected' losses, i.e., those which are not readily predicted and foreseen by management", and a cushion main-

tained in the common practice of banks in the respondent's peer group.

Thus, the majority errs, as I see it, in disturbing the Comptroller's non-arbitrary remedial sanction of requiring a 7 percent capitalization ratio, and in rejecting the Comptroller's use of peer group analysis as a partial aid in determining what is a safe and sound ratio for a bank of the respondent's size and location.

The majority also errs, in my opinion, in finding that substantial evidence did not support the Comptroller's determination the bank's present capitalization ratio is an unsafe and unsound banking practice, that, to be remedied, requires an increase thereof. In construing the evidence as a whole (principally three experts, one for the Comptroller and two academics for the bank), the majority admits that the Comptroller's expert's testimony on its face supports the finding and remedy. However, the majority then finds on the basis of the record as a whole certain deficiencies in this expert's testimony and thus finds it deficient as substantial evidence, in my opinion, largely based on (although not specifically attributed to) the critique of this expert's testimony and the views of the two experts offered by the bank in opposition to the Comptroller's expert. In purporting to review the administrative record as a whole, the majority, I respectfully suggest, has substituted its judgment as to what is a safe and sound capitalization for that of the Comptroller, statutorily authorized to exercise broad discretion in this determination entrusted to his (not the court's) expertise. The majority has in effect accepted the views of the two experts for the bank, whose testimony was specifically rejected by the Comptroller.[1]

The issue before us is whether, as to this particular bank, the Commissioner's determination that it has an inadequate capitalization base is supported by substantial evidence. I am unable to agree with the majority's holding that the Comptroller's determination that the bank's capital level was unsafe and unsound is not supported by substantial evidence. As the majority states, the reviewing court must not substitute its judgment for that of the agency, see *Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d 332, 337 (5th Cir.1980), but the majority nonetheless seems to weigh de novo the evidence of the expert witnesses upon which the Comptroller relies. We must determine only if the Comptroller made a *reasonable* finding, not the finding that we would reach independently, see *id.* at 338; the findings are unreasonable if there is no rational connection between the evidence as a whole and the findings. *J.H. Rose Truck Line Inc. v. Interstate Commerce Comm'n,* 683 F.2d 943, 948 (5th Cir.1982). I am unable to say, as does the majority, that there is *no* rational connection between the evidence in the administrative record and the Comptroller's finding that the Bank had been operating with inadequate capital.

The majority objects primarily to the ALJ's and the Comptroller's reliance on the analysis of qualitative and quantitative factors of capital adequacy offered by the Comptroller's expert, Vaez, who concluded that the Bank's present level of equity capital presented "abnormal risk" to the institution and its depositors and shareholders. The majority emphasizes that Vaez's testimony established that the qualitative characteristics of the bank—quality of management, assets, earnings and liquidity—are strong and that with respect to quantitative

---

1. The ALJ found the Comptroller's expert more persuasive. The Comptroller himself, in his review, pointed out that the bank's two academic experts had dealt with the capital adequacy in a largely abstract context and lacked the Comptroller's expert's extensive experience in evaluating the capital adequacy of particular banks. He further pointed out several views of these academics that ignored, as not relevant, factors previously considered of significance in sound banking practice, pointing out at least one "radical conclusion" substantially at variance with accepted thought. While the ALJ and the Comptroller may well have accepted the views of the bank's experts, they did not do so. The issue before this court is whether the rejection is arbitrary and capricious or not supported by substantial evidence, and I find no reason suggested by the majority that the Comptroller's rejection should be disturbed on review.

factors, the bank's low peer group ranking for the equity capital to total assets ratio does not necessarily mean that the bank *objectively* has an unsafe or unsound capital level.

The majority ignores, however, the areas of Vaez's evaluation upon which the Comptroller could have reasonably based its finding. First, the expert pointed to many qualitative weaknesses of the bank's position—potential "problem assets" because 67% of the loans reviewed lacked adequate collateral or loan documentation, the absence of professional capital planning, poor quality of bank operating practices, management's laxity in documentation—as well as the bank's "obviously deficient" capital base for supporting the present and projected volume of business.[2] No one of these qualitative factors would in itself support a finding that the bank is unsound, especially in light of the high ranking of the Bank in these areas in the Comptroller's 1980 review, but they certainly support the reasonableness of the Comptroller's ultimate conclusion.

The majority primarily takes issue with the significance placed on the bank's low peer group ranking among banks of similar size and the necessity of the seven percent equity capital to total assets ratio for maintaining a safe and sound capital structure.[3] Although a low ranking (even, as here, in the bottom two percent) would not perhaps *in itself* indicate a violation, nevertheless, even considering the bank's experts' criticism of the significance of the ranking, the Comptroller could have reasonably relied on the quantitative factors testified to by the expert that contributed to the bank's low ranking. The expert Vaez emphasized the *decline* of the bank's ratio over a five year period while that of other peer banks in and outside Texas *increased*. In addition to a low relative standing, the bank's performance with respect to asset growth in general (declining), *risk* asset growth (increasing), and overall capitalization ratio (declining), moved in an opposite, negative direction of the general trend of banks of its size, type and location.

I believe that the Comptroller could have made a reasonable connection between the bank's past record in order to find at present an unsafe and unsound capital base, and that given the evidence in the entire record of particular qualitative and quantitative deficiencies, it could reasonably accept the expert Vaez's conclusion that a seven percent capitalization ratio is necessary to cure *this* bank's unsound condition. In reversing the Comptroller's finding in this case, the majority reaches an independent determination of the merits.

2. *Remedial Power to Order Call of Loan to Bank Officer Made in Violation of Law.*

I also object to the majority's interpretation of the Comptroller's power to redress violations of the lending limits to its own officer, C.K. Wolf. 12 U.S.C. § 375a(2). While the majority found that the Comptroller properly directed the bank to correct the violation and to implement policies and procedures to ensure that future violations of section 375a(2) did not occur, it noted that the violation in this case was "corrected" by the amendment of section 375a(2) subsequent to the bank's illegal loan that increased the lending limit to an amount greater than that of the Wolf loan. The majority thus observed that requiring the bank in this case to cancel the loan would be "punitive" and outside the intent of section 1818(b).

2. The majority finds that Vaez employed an overstated asset growth rate projection in determining *future* equity shortfalls, whereas the expert's testimony shows that even the *present* base was inadequate. (R.Vol. IX, p. 18).

3. The majority also states that the significance of the equity capital to total assets ratio is misplaced in light of the bank expert Fraser's dissatisfaction with the use of the standard and

Comptroller Heimann's observation that inadequate earnings, rather than undercapitalization, contributes to bank failures. In this case, however, the Comptroller endeavors to prevent unsafe or unsound conditions *leading to* bank failure, and the capitalization ratio was recognized by one of the bank's experts as a "widely used" measure of the adequacy of the capital base. (R.Vol. XII, pp. 79–80).

It seems to me well within the Comptroller's remedial authority under section 1818(b) to order that the bank affirmatively correct its wrongdoing and "call in" an illegally-made loan, made at a time when, for example, interest rates or other lending considerations would have been different. We should not *require* the Comptroller to, in effect, "ratify" an illegal loan that becomes legal within 15 days because of a statutory change (although, of course, it would not necessarily be an abuse of discretion for the Comptroller *not* to order cancellation in every case).

*Conclusion*

With great respect for my esteemed brothers of the majority, I must nevertheless dissent in part from their persuasive opinion reached in the conscientious exercise of what they feel to be an appropriate (and I feel to be, an inappropriate) level of judicial review.