BANK OF DIXIE, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Respondent.

No. 84–4737.

United States Court of Appeals,
Fifth Circuit.

March 12, 1985.

M. Scott Lawyer, Eric L. Sappenfield, Jackson, Miss., Shaw, Pittman, Potts & Trowbridge, Jack McKay, Washington, D.C., for petitioner.

Eugene A. Miller, Philadelphia, Pa., Lynn B. Montgomery, Memphis, Tenn., for respondent.

Before THORNBERRY, REAVLEY and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

The Bank of Dixie (Bank), a Louisiana bank, appeals a decision of the Board of Directors (Board) of the Federal Deposit Insurance Corporation (FDIC) issuing a Cease and Desist Order to the Bank pursuant to 12 U.S.C. § 1818(b) (1982). Finding no merit in the points of error raised by the Bank, we affirm.

## BACKGROUND

As the result of a January 14, 1983, examination, the FDIC issued to the Bank a Notice of Charges and of Hearing, alleging that the Bank had conducted unsafe and unsound banking practices within the meaning of 12 U.S.C. § 1818(b)(1) (1982).[1] It included a proposed Cease and Desist Order designed to remedy the problems. The Bank denied the allegations and a hearing was conducted before an administrative law judge in February 1984.

At the administrative hearing, the FDIC introduced evidence of three loans which had been renewed without the collection in cash of interest due. An FDIC examiner testified that the renewal or extension of a loan without the collection of interest generally indicates that the borrower is having financial problems, that the failure to collect interest is more hazardous than the failure to collect principal, and that every possible effort should be made to collect interest. In response to questions posed by the Bank, he responded negatively to the question whether it is always an unsafe or unsound practice to extend or renew a loan without the collection of interest.

On the question of inadequate security for loans, the FDIC adduced testimony concerning only one loan; other loans were cited, however, in the January 14, 1983, Report of Examination introduced as evidence of the Bank's financial condition. That report states that, although these loans were adequately secured when made, the value of the collateral securing these loans, contrary to the expectations of management, had declined so that the loans were no longer adequately protected.

The FDIC examiner testified that the Bank had very few written loan amortization or repayment schedules, although he was sure that oral agreements had been reached in some instances. He stated that the establishment of written repayment programs is a basic, sound lending principle. He concluded that oral agreements would lead to confusion and dispute over when loans were scheduled to be repaid because undocumented details could easily be forgotten. The FDIC introduced evidence of one loan which had been renewed without any collection of principal and in spite of an agreed repayment plan.

1. The notice alleged that: (1) loans had been renewed or their due dates had been extended without collection in cash of interest due; (2) loans had been made that were not adequately secured; (3) definite repayment programs for loans had not been established; (4) loans had been renewed without collection of principal and/or enforcement of established repayment programs; (5) credit had been extended to one individual and his related interest which in the aggregate constituted 47% of the Bank's total equity capital; (6) loans had been extended which were secured by collateral subject to substantial senior liens; (7) hazardous lending and lax collection procedures had caused an excessive volume of poor quality assets in relation to total equity capital and reserves and an excessive volume of overdue loans in relation to gross loans; (8) the Bank had failed to maintain an adequate reserve for loan losses; (9) the Bank was operating with an inadequate level of capital protection; (10) the Bank was operating with inadequate provisions for liquidity; (11) management policies were detrimental to the Bank and a threat to its deposits; and (12) the Bank's board of directors had failed to adequately supervise the officers and employees of the Bank.

The January 1983 Report of Examination also indicates that the Bank extended credit to David Lensing, brother of the Bank's president, and his wholly-owned corporation. Considering the debts of Lensing and his corporation in the aggregate, the Bank had extended credit to Lensing in an amount equal to 47 percent of the Bank's total equity capital. Although the loans were subsequently paid, more than half of the debt was classified "Substandard" at the time of the January 1983 examination.

Located in an agricultural community, the Bank extends the majority of its loans to farmers. Testimony at the hearing indicated that these loans are often subject to substantial prior liens. These prior liens are often real estate mortgages and due to the declining value of real estate in the area, the Bank's collateral position in these loans had suffered. The FDIC examiner testified that the Bank could be placed in a position of being forced to take up the large prior liens on the properties pledged as collateral in order to liquidate the debt. He stated that the Bank's highly leveraged position had deprived it of the liquid assets it would need to satisfy these large prior liens. He concluded that the Bank had only a diminished ability to realize its value in the collateral subject to prior liens.

The FDIC also introduced evidence that the Bank had failed to maintain an adequate reserve for loan losses. The Bank indicated that its reserve had been monitored by its board of directors and that the board did not believe the reserve was inadequate. Instead of periodically raising the reserve, the Bank had chosen to write off uncollectible loans in 1983 directly against current income. The FDIC examiner admitted that the ultimate effect of this method is identical to that achieved by increasing the loan loss reserve and charging losses against it. He testified further, however, that the method used by the Bank causes annual income to be misstated because losses may be recognized in a period other than the one in which they are realized.

The FDIC examiner testified that the capital accounts of the Bank as of January 14, 1983, could absorb less than half of the Bank's problem loans before the funds of uninsured depositors would be at risk. The Bank introduced evidence of a capital infusion of $1.2 million which occurred after the January 1983 examination. Evidence was also introduced, however, indicating that the Bank has written off approximately $2.4 million in uncollectible loans during the same time period. These write-offs were charged directly against the Bank's income, thereby reducing its capital.

FDIC testimony indicated that the bank has operated with inadequate provisions for liquidity. An FDIC examiner described liquidity as the ability to convert assets to cash in order to meet normal deposit demands and any unexpected highly volatile deposit outflow with a minimum of loss. The Bank disagreed with the FDIC's conclusion due to the categorization of its "Jumbo" certificates of deposit (Jumbo CDs) (generally defined to include certificates of deposit in excess of $100,000) as potentially volatile liabilities in the computation of liquidity ratios. The Bank cited a FDIC study of its Jumbo CDs which indicated that a large portion of these deposits could generally be regarded as permanent in nature. If the Bank's Jumbo CDs were considered, its liquidity ratios would be acceptable. The FDIC examiner also testified, however, that in the event of a highly volatile deposit outflow, the Jumbo CDs would not be stable.

On June 28, 1984, the ALJ issued an opinion recommending dismissal of the proceeding. The Board rejected the ALJ's recommendation, and on October 19, 1984, it issued a decision and order finding that the Bank had engaged in unsafe or unsound banking practices and concluding that a Cease and Desist Order was appropriate.

The Cease and Desist Order requires the Bank to refrain from: (a) renewing or extending loans without collecting in cash interest due; (b) making loans without establishing and/or enforcing programs for their repayment; (c) failing to provide and

maintain adequate risk diversification in its assets; (d) operating with an inadequate valuation reserve for loan losses; (e) operating with inadequate capital; and (f) operating with inadequate liquidity provisions. The order also requires the Bank to take affirmative action including the following: (a) reduction of "classified" assets; (b) acquisition and future retention of acceptable management; (c) improvement in capital protection; (d) maintenance of adequate loan loss reserve; (e) limitation of loans subject to prior liens; and (f) modification of loan policies.

## CONTENTIONS

■ The Bank's first contention that the Board erred by relying on non-litigated matters refers to recitation in the Board's Decision and Order to loan write-ups in the 1982 and 1983 Reports of Examination by the FDIC. In support of its contention, the Bank inaptly relies on *Engineers & Fabricators, Inc. v. NLRB*, 376 F.2d 482 (5th Cir.1967). In *Engineers & Fabricators*, the court set aside a finding that a statutory violation had occurred, because it was not alleged and the matter was not fully litigated. *Id.* at 485. Although this case involves the introduction of documentary evidence to support a finding, as did *Engineers & Fabricators*, it does not involve findings which were not alleged. The Board did not violate the Bank's right to due process by supporting its Decision and Order with loan write-ups specified in reports which were admitted into evidence without objection at the administrative hearing. The information in the reports was highly relevant to the charges made by the FDIC, was not contested, and the Bank fully understood that it was a basis for the FDIC charges against it. The FDIC did not err by relying on this information in reaching its decision. *See Citizens State Bank v. FDIC*, 751 F.2d 209, 213–14 (8th Cir.1984).

■ The Bank next contends that the Board erred in its decision by failing to consider evidence of improvements made by the Bank in its operating procedures.

We disagree. Determination of whether the offensive practices have actually been abandoned by the Bank is appropriately made through subsequent enforcement proceedings. *Zale Corp. v. FTC*, 473 F.2d 1317, 1320 (5th Cir.1973). Without its Cease and Desist Order, the FDIC has "no valid assurance that if [the Bank] were free of the [FDIC's] restraint it would not continue its former course." *Id.; see also First National Bank v. Comptroller*, 697 F.2d 674, 683 (5th Cir.1983) (comptroller has discretion to enter Cease and Desist Order even though under a subsequent amendment to the statute the same conduct will no longer be a violation).

■ Next, the Bank asserts that the FDIC erred by failing to follow its own procedures because the examiner in charge of the January 14, 1983, examination recommended that an informal agreement, rather than a formal proceeding, be used to correct the Bank's problems. We see no error here. As the Board pointed out in its decision, ultimate authority for determining whether a Cease and Desist Order should issue in a contested proceeding rests with the Board. *See* 12 U.S.C. §§ 1812, 1818 (1982).

■ Finally, the Bank contends that critical FDIC findings are not supported by substantial evidence and that the Cease and Desist Order is arbitrary and capricious. This record proves that there is not the slightest merit to these contentions. There is very substantial evidence in support of the Board's findings, and there is nothing here that was arbitrary and capricious.

AFFIRMED.